**TEXACO, INC., et al.**

v.

**LOUISIANA LAND AND EXPLORATION CO., et al.**

v.

**LaFOURCHE PARISH SCHOOL BOARD, et al.**

**Civ. A. No. 88–998–A.**

United States District Court, M.D. Louisiana.

April 19, 1990.

---

Gene W. Lafitte, Joe B. Norman, Catherine H. Brown, Stevia M. Walther, Liskow & Lewis, New Orleans, La., R. Gordon Kean, G. William Jarman, J. Carter Wilkinson, Linda S. Akchin, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, La., Frederick W. Veters, Patrick J. Butler, John D. Fitzmorris, Jr., Wendy F. Daboval, Texaco, Inc., New Orleans, La., for plaintiffs Texaco, Inc.

Charles D. Marshall, Jr., III, David Schell, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for defendants Louisiana Land and Exploration Co.

William J. Guste, Jr., Atty. Gen., Mary Ellen Leeper, Asst. Atty. Gen., State of La., Baton Rouge, La., Campbell C. Hutchinson, Steven W. Usdin, C. Lawrence Orlandsky, New Orleans, La., for State of La.

Ernest R. Eldred, George L. Clauer, III, David M. Latham, Eldred & Clauer, Baton Rouge, La., for State Mineral Bd. Dept. of Natural Resources.

David L. Landry, Thibodaux, La., for LaFourche Parish School Bd.

Edward C. Abell, Jr., Robert K. Reeves, R. Thomas Jordan, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Mobil Exploration.

A.J. Gray, III, John F. Wadsack, Anna R. Gray, Lake Charles, La., for William B. Lawton Co.

## RULING ON MOTIONS TO DISMISS

JOHN V. PARKER, Chief Judge.

This matter is before the court upon two motions to dismiss Texaco counterclaims filed on behalf of Louisiana. Alternatively, the state moves for a more definite statement of the claims made. The matter is presented to the court upon the report and recommendation of United States Magistrate Christine A. Noland, dated January 29, 1990. The State has filed a series of objections to the report, none of which raise any factual dispute or trigger the requirement under 28 U.S.C. § 636(b)(1) for a de novo determination by the district judge, since the objections simply state or restate legal argument. In her report,

Magistrate Noland recommends denial of the State's motions to dismiss the counterclaims asserted by Texaco, Inc. for want of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted. The State's objection essentially restates its prior legal argument. The only apparently new argument from Louisiana is that the proof of claim was filed as a reaction to Texaco's assumption motion. Texaco has responded to the objections by the State of Louisiana. The court has jurisdiction pursuant to 28 U.S.C. § 1334.

The procedural history and posture of the case is fully set forth in the Magistrate's report, attached hereto as Appendix "A," and will not be repeated here. Suffice it to say that Louisiana claims that Texaco has underpaid royalty payments due the State under oil, gas and mineral leases upon State owned lands under which Texaco is either lessee or sublessee. To the extent that all the leases at issue were not originally granted to Texaco by the State, the Magistrate's statement on page 929 of the report is hereby disapproved. In all other respects, except as may be modified by the discussion, infra, the report of the Magistrate is hereby approved and adopted as the opinion of the court.

Louisiana seeks damages from Texaco and also seeks termination of the leases because of the alleged violations of the leases. The State's claims are asserted in a proof of claim filed by Louisiana in the Texaco bankruptcy proceedings which have been transferred to the bankruptcy court for this district and, since the bankruptcy judge has recused himself, the matter is being heard by the undersigned.

Texaco's counterclaims, which the State seeks to dismiss assert claims for:

(1) In count one, recovery or set off for alleged overpayment of severance taxes to Louisiana from the leases in question;

(2) In count two, recovery or set off for alleged overpayment of royalty to the State based upon federal price controls which

were revised, causing overpayment of severance taxes and royalty;

(3) In count three, recovery or set off for alleged overpayment of royalty apparently unrelated to the leases at issue here.

■ 1. In its objections to the report, Louisiana first contends that Texaco's counterclaims for alleged overpayment of severance taxes, alleged overpayment of mineral royalties, and alleged miscellaneous overpayment of royalties are barred by the Eleventh Amendment. Louisiana relies on Justice Scalia's concurring opinion in *Hoffman v. Connecticut Department of Income Maintenance,* —— U.S. ——, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), and on his dissent in *Pennsylvania v. Union Gas Company,* —— U.S. ——, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). Although the Supreme Court has not clearly held that the Congress has the power to waive the Eleventh Amendment immunity of the states under the Bankruptcy Clause, it is possible for Louisiana itself to waive its Eleventh Amendment immunity by filing a proof of claim, as was done here. [See Magistrate's report, pp. 933–34.]

2. Louisiana next objects to the statement in the report that this suit was originally filed as a proof of claim in a bankruptcy proceeding initiated by Texaco in the Southern District of New York. Louisiana contends that it originally became involved in the case by objecting to Texaco's assumption motion. Technically, Louisiana is correct, however, the statement by the Magistrate, while not as artfully drawn as it might have been, is not incorrect. The Magistrate was referring to the main demand upon which Texaco's counterclaims are based, and the counterclaims were filed in response to Louisiana's proof of claim. In any event, the proof of claim has been filed, and the waiver of immunity which the Magistrate discusses has occurred as a result of this filing.

3. In this objection, Louisiana contends that it is not an "actor" in federal court, but rather that it was forced to react to Texaco's assumption motions. The Magistrate is completely correct. Louisiana did more than just react to Texaco's motion; it

went further and affirmatively asserted a claim for monetary damages for the underpayment of royalties. The filing of that proof of claim waived Louisiana's Eleventh Amendment immunity. Louisiana claims that a move made for "defensive reasons" is not enough to waive Eleventh Amendment immunity. The Magistrate correctly rejects this argument. When Louisiana filed its proof of claim, for whatever reasons, it became an "actor" in the proceedings, as well as a defendant. Although Louisiana argues that the cases relied upon by the Magistrate are not directly analogous to the situation at hand, since in those cases, the state acted in a more "voluntary" manner than the State of Louisiana claims it has in this case, *WJM, Inc. v. Massachusetts Dept. of Public Welfare,* 840 F.2d 996 (1st Cir.1988), which Louisiana attempts to distinguish, argues in support of the position that filing of a proof of claim by Louisiana operates to waive the state's Eleventh Amendment sovereign immunity. In *WJM, Inc.,* the State was required to file its proof of claim, much like Louisiana claims it is required to do to protect its interests in the present case. In *WJM, Inc.,* the First Circuit found that this filing waived the State's Eleventh Amendment immunity. This case argues in favor of a waiver of immunity by way of the filing of the proof of claim.

■ 4. Louisiana also argues that although the court has jurisdiction under 11 U.S.C. § 505(a) to determine the amount or legality of any tax, the court must first look to state law prior to analyzing federal issues. The case cited by Louisiana to support this proposition is a bankruptcy case out of the Northern District of Iowa, which is not persuasive authority. Further, the language of the state statute, La.R.S. 47:1481, says that a party *may* present a claim to the Board of Tax Appeals. This, along with 11 U.S.C. § 505(a), which states that the federal courts may examine the legality of a tax "whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction," supports the conclusion

of the Magistrate that this matter is properly before the court.

■ 5. Next, Louisiana contends that counts one, two and three (A) and (B) of Texaco's counterclaim are barred by common law sovereign immunity, since, Louisiana argues that Article 12, § 10(A) of the Louisiana Constitution of 1974 provides that the State of Louisiana has waived common law sovereign immunity only as to suits in contract and tort, not as to suits for alleged overpayment of taxes and royalties, such as the counterclaims asserted by Texaco. The Magistrate found that any "sovereign immunity defense separate and apart from the Eleventh Amendment, ... has been waived pursuant to Section 106(b)." The Magistrate is correct and Louisiana's arguments to the contrary are unpersuasive.

6. Louisiana next contends that Texaco cannot recover interest from the State due to the Eleventh Amendment and the doctrine of common law sovereign immunity. Again, the Magistrate correctly resolved the issue and the State's arguments to the contrary are not accepted.

■ 7. Louisiana next objects that the Magistrate did not determine whether Texaco's counterclaims are compulsory or not. The Magistrate found that there was no need to determine this issue at this juncture, since these are motions to dismiss for lack of subject matter jurisdiction, and for failure to state a claim, and the jurisdictional issue may be resolved without determining whether the counterclaims are compulsory or permissive. Although it might be helpful to the parties to have a determination made as to whether the counterclaims are compulsory or permissive, it is not necessary to resolve this issue at this time in the light of the Magistrate's finding that jurisdiction exists under 11 U.S.C. § 106(b).

■ 8. In a final objection, the state contends that Texaco did not file a "refund claim" as asserted by the Magistrate, but that it filed a "claim against the State". The language of 11 U.S.C. § 505(a)(2)(B)(i) under which the state claims that Texaco is prematurely requesting federal adjudica-tion of its rights says, "The court may not so determine—any right of the estate to a tax *refund,* before the earlier of—120 days after the trustee properly requests such *refund....*" (Emphasis added.) Louisiana, in its objection to the Magistrate's report now seems to be saying that no request for a refund was ever filed. There is no doubt that Texaco is seeking to be reimbursed for severance taxes which it claims it paid erroneously. Whether the filing of the claim with the Board of Tax Appeals or the filing of the counterclaim amounts to technically a "claim for refund" under Louisiana law is of no moment in this federal court.

For the reasons set forth in the report and recommendation of the Magistrate, and set forth above, the motions to dismiss or alternatively for a more definite statement are hereby DENIED.

## APPENDIX A

### MAGISTRATE'S REPORT

CHRISTINE A. NOLAND, United States Magistrate.

This matter comes before the Court on two motions by the State of Louisiana, the Louisiana Department of Natural Resources and the Louisiana State Mineral Board (collectively, the "State") seeking dismissal of the counterclaims asserted herein by Texaco, Inc. ("Texaco") for want of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted. The State seeks, in the alternative, an order directing Texaco to furnish a more definite statement of its counterclaims. The first motion to dismiss considered herein was filed by the State on June 30, 1989. The second motion to dismiss considered herein was filed by the State on December 21, 1989 and follows pleading amendments by both the State and Texaco.

The State's main demand against Texaco originally was filed as a proof of claim in a bankruptcy proceeding initiated by Texaco in the Southern District of New York. The matter comes to this Court as an adversary proceeding in bankruptcy following trans-

fer from the Southern District of New York and recusal of this District's bankruptcy judge.

In principal part, the State seeks in the demand asserted in its proof of claim to recover for alleged underpayments of natural gas royalties allegedly made by Texaco under oil, gas and mineral leases granted to Texaco by the State (the "State Leases"). The State seeks recovery of, *inter alia*, from at least $387 million to over $500 million (depending upon whether certain leases are declared terminated) in royalties allegedly due, together with a statutory penalty, under La.R.S. 31:139 & 140, of double the amount of royalties due, interest and attorney's fees. The State alleges, *inter alia*, that Texaco knowingly failed to comply with minimum gas royalty provisions contained in the State Leases and that Texaco used two wholly-owned subsidiaries to artificially allocate low-priced gas sales to production from the State Leases in order to minimize its royalty obligations under those leases. The State's claim for underpaid gas royalties covers production on a number of the leases for the period from January 1, 1970 through either December 31, 1985 or the date of judgment, depending upon whether the leases are declared terminated.

In responding to the State's proof of claim, Texaco asserts three counterclaims. In Count One, Texaco seeks to recover nearly $40 million for alleged overpayments of severance taxes made to the State on crude oil and condensate produced within Louisiana, together with approximately $60 million in accrued interest. Texaco alleges that it overpaid severance taxes on crude oil and condensate produced within the state because the price charged for and the severance tax paid on that production was based upon a construction of the federal price control regulations that ultimately was rejected by the governing federal regulatory agency. Under federal pricing regulations adopted in 1973, a two-tiered pricing system was established for crude oil sales, under which regulated ceiling prices were established for "old oil" and higher market prices were permitted for "new oil". The regulations provided that if production from a given "property" exceeded the "base production control level" for a particular month, then the "excess" production could be sold at higher market prices as "new oil". In making sales and paying taxes on crude oil produced within the state, Texaco treated the reservoir-wide drilling units established by the Louisiana Office of Conservation as "properties" under the federal price control regulations, such that all production from a given drilling unit in a month that exceeded the "base production control level" could be sold at the higher market price allowed for "new oil". However, the Federal Energy Agency subsequently retroactively defined the term "property" as the premises described by a single oil and gas lease rather than the state agency's reservoir-wide production unit and this regulatory action was upheld by the Temporary Emergency Court of Appeals. As a result, Texaco must pay over one billion dollars to the Department of Energy pursuant to a consent order resolving the conflict over the maximum lawful price that could be charged for the crude oil production.

In the present litigation, in Count One, Texaco seeks to recover alleged overpayments of severance taxes on crude oil produced and sold from January 1, 1974 through January 27, 1981, the period during which crude oil production was being sold and taxed as higher-priced "new oil" under the later-rejected construction of "property". Texaco's refund claim applies to all crude oil produced by Texaco in Louisiana and sold as "new oil" under the rejected construction of "property". For this reason, the overpayment claim includes a claim for alleged severance tax overpayments on crude oil and condensate from the aforementioned State Leases that was produced and sold erroneously as "new oil". Texaco seeks a judgment in its favor and against the State for the approximately $40 million in alleged overpayments, together with approximately $60 million in accrued interest, or, at the very least, an offset in the total amount against any re-

covery had by the State against Texaco on its main demand.

In Count Two, Texaco asserts a related claim for recovery of approximately $55 million, plus interest, in alleged overpayments of mineral royalties paid to the State. Texaco refers again on this claim to its sale of oil from State leases as "new oil" based upon its treatment of reservoir-wide drilling units as "properties" under the federal price control regulations. Texaco alleges in Count Two that, as a consequence of its higher-priced sales based upon this later-rejected construction of the term "property" under the federal regulations, it made corresponding overpayments of oil production royalties to the State, in that the royalty to be paid on the production was based upon its sales price. On Count Two, Texaco seeks an affirmative recovery against the State for the approximately $55 million in alleged overpayments, plus interest, or, in the alternative, an offset in the total amount against any recovery had by the State against Texaco in these proceedings.

In Count Three, Texaco seeks to recover a total of approximately $3.3 million, plus interest, on nine miscellaneous and apparently unrelated royalty overpayment claims. On these claims, Texaco also seeks affirmative recovery against the State or, in the alternative, an offset against any recovery had by the State.

In seeking dismissal of these claims, the State contends:

(1) that all of Texaco's counterclaims are barred by the Eleventh Amendment;

(2) that all of the claims, except for seven of the nine Count Three counterclaims, also are barred by the common law doctrine of sovereign immunity;

(3) that Texaco's claim for interest on its Count One severance tax overpayment claim is barred by the Eleventh Amendment and common law sovereign immunity;

(4) that the severance tax overpayment claim asserted in Count One is premature because it was asserted prior to the expiration of the 120 day waiting period provided under 11 U.S.C. § 505 for assertion of certain tax refund claims in bankruptcy;

(5) that Texaco has failed to state a claim for relief on Count One because La.R.S. 47:1481 does not create a claim nor provide a jurisdictional basis for Texaco to proceed with its tax refund claim in federal court;

(6) that assertion of the Count One tax refund claim in this adversary bankruptcy proceeding in any event is barred by a prior stipulation pertaining to certain tax claims asserted in the bankruptcy case by the Louisiana Department of Revenue; and

(7) that Texaco has failed to state a claim for relief under 11 U.S.C. § 505 on Counts One and Two.

The State further contends, in the alternative, that Texaco should be required to provide a more definite statement of its counterclaims. Each of these contentions will be addressed below in turn.

*Eleventh Amendment and Sovereign Immunity (Issues One and Two)*

The State urges that Texaco's counterclaims are barred by the Eleventh Amendment and the doctrine of sovereign immunity. With limited exception, the Eleventh Amendment and the doctrine of sovereign immunity preclude suit against a State in federal court absent consent by the State. *E.g., Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985). Paragraphs (a) and (b) of Section 106 of the Bankruptcy Code, 11 U.S.C. § 106(a) & (b), purport to effect a waiver of this immunity from suit in federal bankruptcy court in certain limited circumstances. *See generally Hoffman v. Connecticut Department of Income Maintenance,* —— U.S. ——, 109 S.Ct. 2818, 2822, 106 L.Ed.2d 76 (1989) (plurality opinion). Thus, in order to address the State's claim of Eleventh Amendment and sovereign immunity, the Court must determine, first, whether Section 106 authorizes the Court to assert jurisdiction over Texaco's

counterclaims and, second, whether such an assertion of jurisdiction under Section 106 is constitutional under the Eleventh Amendment.

Section 106 of the Bankruptcy Code authorizes the assertion of compulsory counterclaims and, to the extent that such claims offset recovery on the main demand, permissive counterclaims against a State that asserts a claim against the debtor's estate in the bankruptcy proceeding. Paragraph (a) of Section 106 provides that "[a] governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose." 11 U.S.C. § 106(a).[1] Paragraph (b) of Section 106 provides that "[t]here shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate." 11 U.S.C. § 106(b).

In the instant case, the parties have argued at great length in their memoranda regarding whether Texaco's counterclaims "arise out of the same transaction or occurrence" as the State's main demand so as to permit Texaco to seek affirmative recovery against the State on the claims as compulsory counterclaims under Section 106(a). However, it appears to the Court that, at the very least, Texaco can assert the counterclaims as permissive counterclaims under Section 106(b), if Section 106(b) is constitutional, such that Texaco can pursue the claims as a setoff against any recovery had by the State but cannot obtain an affirmative recovery under Section 106(b). The State in fact conceded this point during the first briefing cycle on its motion to dismiss,[2] but now urges that Section 106(b) authorizes the setoff only of claims that previously have been liquidated in another forum. Yet this argument finds absolutely no support in the plain language of the statute, which provides for the offset of "*any claim* against [the] governmental unit that is property of the estate." 11 U.S.C. § 106(b) (emphasis added). The term "claim" means a "right to payment, *whether or not such right is reduced to judgment, liquidated, unliquidated,* fixed, contingent, matured, unmatured, *disputed, undisputed,* legal, equitable, secured, or unsecured." 11 U.S.C. § 101(4)(A) (emphasis added).[3] The Court therefore can assert jurisdiction under Section 106(b) of the Bankruptcy Code, if constitutional, over Texaco's counterclaims at the very least to the extent that Texaco seeks an offset against any recovery had by the State.

Accordingly, the only practical relevance of the question of whether Texaco's counterclaims "arise out of the same transaction or occurrence" as the State's main demand is to determine whether Texaco can go further and obtain an affirmative monetary award against the State should Texaco's recovery on its counterclaims for approximately $158.3 million exceed the State's recovery on its main demand for $387 to $500 million plus statutory penalties, interest and attorney's fees. Yet, with the Court's jurisdiction over the counterclaims established under Section 106(b) —to the extent the statute is constitutional—there is absolutely no need at this juncture to issue an advisory ruling on the question of whether Texaco's counterclaims constitute compulsory counterclaims under Section 106(a). The Court need address that issue only if and when Texaco establishes a right to recovery of a sum on its counterclaims that is greater than any

---

1. Under 11 U.S.C. § 101(26), the definition of "governmental unit" includes a State as well as a "department, agency, or instrumentality of ... a State."

2. *Reply Memorandum in Support of Motion to Dismiss Counterclaim and, Alternatively, Motion for More Definite Statement,* filed August 29, 1989, at 11.

3. Indeed, a Supreme Court plurality has stated in *dicta* that the use of this term in subsections (a) and (b) of Section 106 provides "express authorization for monetary recovery from the States." *Hoffman,* 109 S.Ct. at 2823.

sum awarded to the State on its main demand. The only jurisdictional question that remains ripe for decision at this point therefore is whether assertion of jurisdiction under Section 106(b) violates the Eleventh Amendment and the doctrine of sovereign immunity.

The development of Eleventh Amendment doctrine in the Supreme Court presently is in a state of flux and a clear consensus on several key issues is not yet evident in that Court. In recent cases, the Court has failed to achieve a majority and the justices have varied widely in their views.[4] In yet another pivotal Eleventh Amendment decision, the Court was able to attain only an uneasy majority.[5] However, under the law as it now stands, three basic situations arise in which assertion of a claim against a State in federal court will

not violate the principle of sovereign immunity embodied in the Eleventh Amendment.

First, suit against a State in federal court will not be barred by Eleventh Amendment immunity if the State has consented to suit in federal court on the claim presented. *See, e.g., Atascadero State Hospital v. Scanlon,* 473 U.S. at 238, 105 S.Ct. at 3145. This consent most commonly is reflected in an express state constitutional or legislative pronouncement authorizing suit on the claim in federal court. In such cases, the expression of State consent to federal suit on the type of claim presented must be stated " 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' " *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974),

---

**4.** For example, in *Hoffman v. Connecticut Department of Income Maintenance,* —— U.S. ——, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), a plurality of four justices, in an opinion authored by Justice White, would have held that Congress did not abrogate Eleventh Amendment immunity under 11 U.S.C. § 106(c) because it did not make such an intent "unmistakably clear" in the text of the statute. Justice Scalia concurred in the judgment only, urging that Congress could not constitutionally abrogate Eleventh Amendment immunity in the exercise of its Article I powers. Justice O'Connor, in a separate concurring opinion, agreed with Justice Scalia on the constitutional issue, but, because a majority of the Court instead addressed the statutory construction issue, she expressed her agreement with and joined in Justice White's plurality opinion. The four dissenters, in two separate dissenting opinions, concluded both that Congress had made its intent to abrogate Eleventh Amendment immunity "unmistakably clear" and that Congress in fact had the constitutional power under the Bankruptcy Clause of Article I to abrogate the immunity. And, in *Welch v. State Department of Highways and Public Transportation,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987), four dissenting justices advocated overruling the holding in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), that the Eleventh Amendment bars claims against the States in federal court that are based on federal question jurisdiction. The four justices of the *Welch* plurality adhered to the *Hans* holding, but Justice Scalia, concurring in part and concurring in the judgment, was unwilling to address the issue since it had been introduced relatively late in the proceedings before the Supreme Court.

**5.** In *Pennsylvania v. Union Gas Co.,* —— U.S. ——, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), a majority of five justices held that Congress had, in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.,* as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. 99–499, 100 Stat. 1613, made its intent to abrogate the State's Eleventh Amendment immunity "unmistakably clear" in the text of the statute. Four of the five majority justices then proceeded to conclude, as a plurality, that Congress had the constitutional power to abrogate the States' Eleventh Amendment immunity in the exercise of Congress' Article I authority under the Commerce Clause. Justice White, joined by three other justices, found no "unmistakably clear" evidence of Congressional intent to abrogate Eleventh Amendment immunity. Then, since the majority had concluded otherwise on the statutory construction issue, Justice White proceeded, without the other three justices, to reach the constitutional question. On this issue, Justice White expressed agreement with the plurality's conclusion that Congress could abrogate the immunity under the Commerce Clause, but stated that he did not agree with much of the reasoning advanced by the plurality. Justice White's qualified vote on the constitutional issue supplied the fifth vote required to affirm the decision of the lower court rejecting the immunity defense. Three other separate opinions were filed as well, offering further divergent views concerning the path that Eleventh Amendment doctrine should take.

*quoting Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909).[6]

Second, a State waives its Eleventh Amendment immunity by participating in an activity when Congress has made waiver of immunity a necessary condition of participation by a State in the activity. *See Parden v. Terminal Railway of Alabama Docks Department,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Yet, in order for a State's participation in an activity to give rise to waiver of its Eleventh Amendment immunity, the language of the Congressional statute in question must manifest "a clear intent to condition participation ... on a State's consent to waive its constitutional immunity." *Atascadero State Hospital,* 473 U.S. at 247, 105 S.Ct. at 3149–50; *see also Welch v. State Department of Highways and Public Transportation,* 483 U.S. 468, 478 & 496, 107 S.Ct. 2941, 2948 & 2958, 97 L.Ed.2d 389 (1987) (a four-justice plurality, joined by a fifth justice concurring in part, overruled *Parden* to the extent that it did not require unmistakably clear textual language for Congressional abrogation of Eleventh Amendment immunity). That is, in this circumstance, Congress must give clear notice to the States that their participation in the activity is conditioned upon a waiver of sovereign immunity. In this context, although the loss of Eleventh Amendment immunity finds its genesis in a Congressional enactment, the loss of immunity ultimately is grounded in waiver and consent by the State through conduct.[7]

Third, a private citizen's suit against a State in federal court will not violate the Eleventh Amendment—without regard to consent or waiver by the State—when Congress abrogates or overrides that immunity pursuant to its regulation of State conduct under certain of its enumerated plenary powers under the Constitution. *Pennsylvania v. Union Gas Co.,* —— U.S. ——, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). Here, too, however, if Congress desires to override the States' Eleventh Amendment immunity, it must make its intent to do so "unmistakably clear" in the text of the statute. *Atascadero State Hospital v. Scanlon,* 473 U.S. at 242, 105 S.Ct. at 3147. To date, the Supreme Court has recognized Congress' authority to abrogate the States' Eleventh Amendment immunity when exercising its legislative authority under the Commerce Clause and under Section 5 of the Fourteenth Amendment. *See Pennsylvania v. Union Gas Co., supra* (Commerce Clause); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (Section 5 of the Fourteenth Amendment). The Court has not yet reached the question of whether Congress has authority in the exercise of its regulatory power under the Bankruptcy Clause to abrogate the States' Eleventh Amendment immunity without regard to their waiver or consent to suit in federal court. *See Hoffman,* 109 S.Ct. at 2824.

In the instant case, the State necessarily has consented to assertion of Texaco's counterclaims in this federal bankruptcy proceeding on two recognized grounds. First, under traditional principles long-established in Supreme Court jurisprudence, the State has consented to assertion of the counterclaims by itself asserting a claim for relief in federal court. Second, the State's filing of its proof of claim in this

---

**6.** *See also Atascadero State Hospital v. Scanlon,* 473 U.S. at 238 n. 1, 105 S.Ct. at 3145 n. 1 ("unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment"); *Platoro Limited, Inc. v. Unidentified Remains of a Vessel, Etc.,* 695 F.2d 893, 899 (5th Cir.1983) (application of rule to state legislative waiver of immunity).

**7.** *See Pennsylvania v. Union Gas Co.,* —— U.S. ——, 109 S.Ct. 2273, 2281 & 2286 n. 5, 105 L.Ed.2d 1 (1989) (plurality discussion of consensual State waiver under *Parden* as distinct from

nonconsensual abrogation by Congress); *Atascadero State Hospital,* 473 U.S. at 238 n. 1, 105 S.Ct. at 3145 n. 1 ("A State may effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program."); *but see Pennsylvania v. Union Gas Co.,* 109 S.Ct. at 2302–03 (Scalia, J., concurring in part and dissenting in part) (questioning the viability of a distinction between waiver by participation and abrogation).

proceeding constitutes a binding waiver of immunity as to Texaco's offset counterclaims pursuant to Section 106(b) and the theory of waiver enunciated in *Parden.*

Although it is well-established that a State does not waive its Eleventh Amendment immunity by appearing and defending a claim asserted against it in federal court,[8] it also has long been established that a State waives its immunity when it becomes "an actor as well as defendant" by asserting a claim for relief in federal court. *See Clark v. Barnard*, 108 U.S. 436, 447–48, 2 S.Ct. 878, 883, 27 L.Ed. 780 (1883) (the State consented to suit in federal court when it intervened and asserted a claim to the fund in controversy).[9] The Supreme Court applied this principle in the context of bankruptcy proceedings in *Gardner v. State of New Jersey*, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), holding that the Eleventh Amendment did not bar a trustee's petition in the bankruptcy court to adjudicate objections raised by other creditors to a proof of claim filed by a State for unpaid taxes. In so holding, a unanimous Court observed:

> The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a res. It is none the less such because the claim is rejected in toto, reduced in part, given a priority inferior to that claimed, or satisfied in some other way other than payment in cash. When the State becomes the actor and files a claim against the fund it waives any immunity which it otherwise might have had respecting the adjudication of the claim.

329 U.S. at 574, 67 S.Ct. at 472. Although the *Gardner* Court was not called upon to directly address the situation where a counterclaim is directed at the State in response to its proof of claim, *Gardner*'s rationale supports a finding of waiver with respect to the setoff counterclaims presented here. By filing its proof of claim, the State is seeking an adjudication of its claimed interest in the fund represented by the debtor's estate. In light of the nature and purposes of the bankruptcy proceeding, it is entirely reasonable under *Gardner* and *Clark* to find that the State, by such action, has waived any claim of immunity as to setoff claims of the estate that result in the State's claim being "rejected in toto, reduced in part, ... or satisfied in some way other than payment in cash." *Gardner, supra.* Thus, the State, by asserting its claim for relief in this federal bankruptcy proceeding, has become "an actor" in this proceeding and thereby has consented to the assertion of counterclaims by Texaco to the extent that Texaco seeks to diminish the recovery had by the State on its proof of claim.[10]

Further, under *Parden*, the State has waived its Eleventh Amendment immunity by filing its proof of claim because Congress, in Section 106(b), made waiver of immunity a necessary condition of State participation in federal bankruptcy proceedings when a State participates by filing a proof of claim. It is true that *Welch* overruled *Parden* to the extent that *Parden* did not require "unmistakably clear" language in the text of the Congressional enactment. However, in the text of Section 106, Congress indeed did make it unmistakably clear that a State waives its immunity

---

**8.** *See, e.g., Edelman v. Jordan,* 415 U.S. at 677–78, 94 S.Ct. at 1362–63 (the Supreme Court will consider the Eleventh Amendment defense even if the defense is not raised by the State while the matter is being tried in the trial court).

**9.** Although of ancient vintage, the *Clark* decision still is cited frequently by the Supreme Court as a paradigm case of a State's consent to suit in federal court. *See, e.g., Welch,* 483 U.S. at 473, 107 S.Ct. at 2945 (plurality); *Atascadero State Hospital v. Scanlon,* 473 U.S. at 238, 105 S.Ct. at 3145; *Parden,* 377 U.S. at 186, 84 S.Ct. at 1210.

**10.** *See also United States v. Roth,* 164 F.2d 575 (2nd Cir.1948) (sovereign immunity did not bar the trustee's claim for a setoff of one year's tax overpayment against the proof of claim filed by the United States for delinquent taxes for other years, in that the Bankruptcy Act treated the United States like other creditors, which were required to submit a proof of claim subject to claims of setoff by the estate); *In re St. Joseph's Hospital,* 103 B.R. 643, 650 (Bankr.E.D.Pa.1989) (the court held that the State consented to suit and waived its immunity pursuant to Section 106 by filing a proof of claim, following language in *Hoffman* and *Clark v. Barnard* ).

when it asserts a claim in federal bankruptcy proceedings and that the State thereby subjects itself to compulsory counterclaims as well as to permissive counterclaims applied as setoffs. *Cf. Hoffman*, 109 S.Ct. at 2822 (the plurality referred to the "narrow" and "carefully limit[ed]" waivers in subsections (a) and (b) of Section 106 as counseling against the broad construction of subsection (c) urged by the petitioner). The State's argument that the language of Section 106(b) does not unambiguously manifest an intent to permit permissive counterclaims against a State in bankruptcy proceedings has been considered and rejected above at page 931. Thus, under the *Parden* theory of waiver, the State has waived its immunity from suit in federal bankruptcy court on Texaco's setoff counterclaims.

The State strenuously urges that the loss of Eleventh Amendment immunity presented here under Section 106 is premised not upon consent or waiver but instead upon nonconsensual abrogation of the constitutional immunity by Congressional statute. Proceeding from this premise, the State maintains that Congress has no power under the Bankruptcy Clause of the Constitution to statutorily override or abrogate the constitutional immunity recognized in the Eleventh Amendment. In making this argument, the State relies in large part upon certain separate remarks made by Justice Scalia in recent Supreme Court decisions.

In *Pennsylvania v. Union Gas Co., supra*, Justice Scalia, joined by three other dissenters, criticizes the *Parden* theory of waiver as being in actuality no different from the nonconsensual loss of immunity by abrogation pursuant to Congress' Article I powers. *See* 109 S.Ct. at 2302–03. Justice Scalia urges, perhaps with some merit, that there is nothing more than a semantical difference between saying, on the one hand, that Congress has legislatively abrogated the States' Eleventh Amendment immunity against suits based upon a certain activity and saying, on the other

hand, that Congress has by statute provided that a State's participation in the activity constitutes a waiver of the immunity. That is, Justice Scalia maintains that "there is little more than a verbal distinction"[11] between the statement, on the one hand, that Congress has created a private cause of action permitting recovery for a State's commission of an act or possession of a status and has abrogated the State's immunity from suit in federal court on that cause of action, and the statement, on the other hand, that Congress has conditioned the State's commission of the act or possession of the status upon a waiver of immunity on the federal cause of action created by Congress. 109 S.Ct. at 2303. In both instances, according to Justice Scalia, Congress is doing substantially the same thing—circumventing the Eleventh Amendment in the exercise of its Article I regulatory powers. *Id.* And, being of the view that Congress has no power under Article I to abrogate Eleventh Amendment immunity, Justice Scalia therefore contends that *Parden* and its theory of waiver also should be completely overruled. *Id.*

Following upon Justice Scalia's dissenting views, the State contends here that Congress has no power to abrogate Eleventh Amendment immunity by statute pursuant to the Bankruptcy Clause (a question expressly reserved by the Supreme Court in *Hoffman*) and that Congress similarly has no power to condition a state's participation in federal bankruptcy proceedings on a waiver of the immunity, in that such a waiver is in substance no different from abrogation. However, regardless of whatever merit Justice Scalia's arguments might have in other contexts, the waiver created by Section 106(b) is in fact quite different in substance from the nonconsensual abrogation recognized in the cases of *Pennsylvania v. Union Gas Co.* and *Fitzpatrick v. Bitzer*. Under Section 106(b), waiver results not from the act or status giving rise to the claim of liability against the State but, rather, from conduct by the State that is separate and distinct from the activity or status upon which the State's

**11.** 109 S.Ct. at 2303.

alleged liability is based. That is, the State's waiver under Section 106(b) is premised upon a conscious act—the filing of a proof of claim—that is independent of the circumstances giving rise to the State's alleged liability—here, alleged overpayment of severance taxes and mineral royalties. Justice Scalia's criticism of *Parden*'s waiver theory therefore has no application here and the State's contention that this case involves abrogation of immunity rather than a true waiver of immunity accordingly misses the mark. Thus, given Congress' unequivocal notice to the States that the filing of a proof of claim waives immunity to counterclaims of this sort, it is entirely appropriate to apply *Parden*'s theory of waiver in this situation, regardless of whatever questions may be raised as to the theory's merit in other contexts.[12]

Since the State has consented to suit in federal court by virtue of its waiver under Section 106(b), there is no need for the Court to reach the question that was reserved in *Hoffman* of whether Congress has the power under the Bankruptcy Clause to override and abrogate the States' Eleventh Amendment immunity without regard to their consent. Further, to the extent that the State here might have a sovereign immunity defense separate and apart from the Eleventh Amendment, any

such defense has been waived pursuant to Section 106(b). Accordingly, the State should be found to have waived its defense of immunity to Texaco's counterclaims to the extent that the counterclaims seek a setoff against any recovery by the State.

*Immunity and Liability for Interest (Issue Three)*

The State contends that Texaco cannot recover interest on its Count One severance tax overpayment claim and cites to older Supreme Court of Louisiana decisions[13] holding that the State has immunity from claims for interest unless recovery of interest from the State is provided for by contract or statute. Texaco urges in response that this state law rule of immunity from recovery of interest is no longer applicable in Louisiana and relies upon jurisprudential and state constitutional authorities of a more recent vintage.[14] However, the Court need determine whether the State enjoys state law sovereign immunity from recovery of interest on a severance tax overpayment claim if and only if any such defense has not been waived under Section 106 by the State's filing of a proof of claim in these proceedings.

The State maintains that Section 106 does not authorize the recovery of interest against a State. The State relies upon the decision of the United States Supreme

---

**12.** Indeed, the waiver in *Parden* can be viewed as being based upon action by the State that was independent of the acts giving rise to the State's liability. In *Parden,* the State was sued by a State-employed railroad worker under the Federal Employers' Liability Act (FELA), which provides a remedy for railroad workers injured by employer negligence. The railroad in question was a state-owned railroad which "perform[ed] services for profit under statutory authority authorizing it to operate 'as though it were an ordinary common carrier.'" 377 U.S. at 185, 84 S.Ct. at 1209. Arguably, the waiver in *Parden* thus was based on the State's decision to perform a traditionally private function on a proprietary basis for profit. This distinction was recognized in *Employees v. Missouri Department of Public Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), which held that a State's employment of employees in nonproprietary, not-for-profit State hospitals was not conditioned upon forfeiture of immunity from suit in federal court by the employees

against the State under the Fair Labor Standards Act. *See* 411 U.S. at 284–85, 93 S.Ct. at 1617–18. *But cf.* J. Orth, *The Judicial Power of the United States,* at 11 (1987), *quoted in Welch,* 483 U.S. at 520 n. 20, 107 S.Ct. at 2970 n. 20 (Brennan, J., dissenting): "By the late twentieth century the law of the Eleventh Amendment exhibited a baffling complexity[,] ... replete with historical anomalies, internal inconsistencies, and senseless distinctions ... [becoming] ... an arcane specialty of lawyers and federal judges."

**13.** *State ex rel. Anderson v. Walker,* 233 La. 687, 98 So.2d 153 (1957); *Jefferson Lake Sulphur Co., Inc. v. State,* 213 La. 1, 34 So.2d 331 (1947).

**14.** *E.g., Carr v. State Through Department of Health and Human Resources,* 451 So.2d 1282 (La.App. 1st Cir.1984); *Southern Construction Co. v. Housing Authority of Opelousas,* 250 La. 569, 197 So.2d 628 (1967); La.Con. art. 12, sec. 10 (1974).

Court in *Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), and the decisions of the First Circuit in *Rogers v. Okin,* 821 F.2d 22 (1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988), and *WJM, Inc. v. Massachusetts Department of Public Welfare,* 840 F.2d 996 (1988), as support for this contention. In *Library of Congress v. Shaw,* the Supreme Court held that an attorney-fee award against the United States under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* could not be enhanced to compensate the plaintiff's counsel for the delay in receiving payment for his services. The Court concluded that such an enhanced award would violate the recognized rule that the United States is immune from an interest award in the absence of express congressional consent to the award of interest separate from a general waiver of immunity from suit. The enhanced attorney-fee award in question violated this "no-interest rule" because it provided for compensation for a delay in the payment of money, which the Court considered to be the functional equivalent of interest. 478 U.S. at 314–23, 106 S.Ct. at 2961–66.

In *Rogers v. Okin,* the First Circuit applied *Library of Congress v. Shaw* in the Eleventh Amendment immunity context and held that the no-interest rule precluded the enhancement of an attorney-fee award against a State under 42 U.S.C. § 1988 where enhancement was sought to compensate the plaintiff's attorney for the delay in payment of attorney's fees. 821 F.2d at 26–28. In making this holding, the First Circuit acknowledged that the degree of congressional clarity required in the Eleventh Amendment context appeared to be less than that required in regard to federal sovereign immunity but nonetheless rejected the plaintiff's arguments based upon the differing standards governing immunity in the two contexts. *Id.* And, in its *WJM, Inc.* decision, the First Circuit extended its application of the no-interest rule in the Eleventh Amendment immunity context and held that interest could not be recov-

ered on a counterclaim asserted in bankruptcy against a State pursuant to Section 106(a), on the ground that Congress had not expressly indicated its intention to subject the States to this element of damages. 840 F.2d at 1005–06. Relying on these First Circuit decisions, the State accordingly urges that it has not waived its immunity defense to Texaco's claims for interest on its severance tax overpayment claim by virtue of Section 106.

The propriety of the First Circuit's extension of *Library of Congress v. Shaw* to the Eleventh Amendment context is subject to substantial question, however. In *Jenkins v. Missouri,* 838 F.2d 260 (1988), the Eighth Circuit disagreed with the First Circuit's *Rogers v. Okin* decision and held, to the contrary, that the no-interest rule of *Library of Congress v. Shaw* was not applicable in a case involving the Eleventh Amendment and therefore did not preclude the enhancement of an attorney-fee award against a State under 42 U.S.C. § 1988 where enhancement was sought to compensate the plaintiff's attorney for the delay in payment of attorney's fees. 838 F.2d at 265. In making this holding, the Eighth Circuit stated, *inter alia:*

> "... *Shaw* was expressly based on the "no interest" rule of statutory interpretation applicable in suits against the federal government. 106 S.Ct. at 2962–63. *Rogers* does not explain why it considers *Shaw's* federal sovereign immunity holding applicable in an eleventh amendment setting, and indeed *Rogers* acknowledges that the two areas of law carry 'different standards of statutory interpretation.' 821 F.2d at 27."

*Id.*

Due to the conflict in the Eighth and First Circuit precedents, the Supreme Court granted certiorari in *Jenkins.* Then, in *Missouri v. Jenkins,* — U.S. —, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the Supreme Court affirmed the Eighth Circuit decision in *Jenkins v. Missouri* and expressly rejected the contrary First Circuit decision in *Rogers v. Okin.* In responding to Missouri's line of argument based upon

*Library of Congress v. Shaw*, the Supreme Court stated, *inter alia:*

> Our opinion in *Shaw* does, to be sure, contain some language that, if read in isolation, might suggest a different result in this case..... These observations, however, cannot be divorced from the context of the special "no-interest rule" that was at issue in *Shaw*. *That rule, which is applicable to the immunity of the United States and is therefore not at issue here, provides an "added gloss of strictness,"* id., [478 U.S.] at 318, 106 S.Ct. at 2963, *only where the United States' liability for interest is at issue.*.... Outside the context of the "no-interest" rule of federal immunity, we see no reason why compensation for delay cannot be included within § 1988 attorney's fee awards, which *Hutto* held to be "costs" not subject to Eleventh Amendment strictures. *We cannot share Justice O'Connor's view that the two cases she cites, post, [109 S.Ct.] at 2474, demonstrate the existence of an equivalent rule relating to State immunity that embodies the same ultra-strict rule of construction for interest awards that has grown up around the federal no-interest rule.*

109 S.Ct. at 2468 n. 3 (emphasis added).

The expressions of the Supreme Court in *Missouri v. Jenkins* of course are only *dicta* with regard to the question of whether a waiver of a State's immunity defense pursuant to Section 106(b) encompasses a waiver of immunity with respect to interest as an element of damages. However, that *dicta* counsels rather strongly against the application here "of an equivalent rule relating to State immunity that embodies the same ultra-strict rule of construction for interest awards that has grown up around the federal no-interest rule." 109 S.Ct. at 2468 n. 3. Accordingly, until such time as there is some further expression on the issue from the Supreme Court or the Fifth Circuit, the Court will not apply the "added

gloss of strictness" of the federal no-interest rule of statutory construction in the Eleventh Amendment immunity context. Thus, Texaco's claim for interest is not barred by the State's claim of immunity in this litigation, at least to the extent that any recovery of interest by Texaco is applied as a setoff against any recovery had by the State.

### Prematurity (Issue Four)

The State contends that Texaco's severance tax overpayment counterclaim is premature because it was asserted prior to the expiration of the 120 day waiting period provided under 11 U.S.C. § 505 for assertion of certain tax refund claims in bankruptcy. Subparagraph (a)(1) of Section 505 authorizes a bankruptcy court to determine the amount or legality of any tax. 11 U.S.C. § 505(a)(1). However, subparagraph (a)(2)(B) of Section 505 prohibits the court from determining any right of the estate to a tax refund before the earlier of: (1) 120 days after a refund is sought from the governmental unit from which the refund is claimed or a determination, or (2) a determination on the refund request by the governmental unit. 11 U.S.C. § 505(a)(2)(B)(i) & (ii).

Texaco filed its refund claim, pursuant to La.R.S. 47:1407(4) and La.R.S. 47:1481, with the Louisiana Board of Tax Appeals on April 28, 1989. The State first contends that Texaco's claim in the Board of Tax Appeals does not constitute a request for a refund "from the governmental unit from which such refund is claimed" under Section 505(a)(2)(B)(i) because the request is not directed to the "Louisiana Department of Revenue". This hypertechnical objection by the State is belied by the State's own representation in brief that "LSA–R.S. 47:1481 et seq set forth a procedure by which a taxpayer who has a claim for money erroneously paid into the Louisiana state treasury may present that claim to the board of tax appeals." [15] Section 1481 quite clearly provides that "[a]ny person who has a claim *against the State of Loui-*

---

**15.** *Memorandum of the State of Louisiana in Support of Motions under Federal Rule of Civil Procedure 12 and Bankruptcy Rule 7012,* at 8.

siana for money erroneously paid into the State Treasury, or for any other claim, may present such claim to the board of tax appeals." La.R.S. 47:1481 (emphasis added). Texaco has asserted a refund claim under Section 1481 against "the State of Louisiana" in the Board of Tax Appeals for severance taxes allegedly erroneously paid into the state treasury. The State's hypertechnical objection that Texaco must seek refund from "the Louisiana Department of Revenue" simply lacks merit.

The State next relies upon a statement by the plurality in *Hoffman* that a determination of the amount or legality of a tax pursuant to Section 505(a) "obviously should bind the governmental unit but that does not require a monetary recovery from a State." 109 S.Ct. at 2823. However, while Section 505 may not itself authorize a monetary recovery against a State, Section 106(b), as discussed above, does permit a claim by the estate to be offset against any recovery had by a State on a proof of claim. The *Hoffman* plurality was discussing Section 505(a) in a case where no proof of claim had been filed by the State and Eleventh Amendment immunity therefore applied to bar any claim by the estate against the State. Where the State *has* filed a proof of claim and has thereby waived its immunity pursuant to Section 106(b), however, the plurality's statements regarding Section 505 should not be read out of context so as to preclude the assertion of a tax refund claim as an offset against any recovery by the State.

The State's final contention with regard to Section 505 is that Texaco's severance tax overpayment counterclaim should be dismissed because Texaco has failed to allege that 120 days have elapsed from the filing of a request for refund. However, even if Texaco's counterclaim in fact was premature under Section 505(a)(2)(B), dismissal of that claim is not required here.

A premature filing can be cured under Rule 15(d) of the Federal Rules of Civil Procedure if the claimant files a supplemental pleading stating that the time required as a condition precedent to suit has elapsed. *See generally* 6 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1505, at 545 (1971). Here, the 120 day period required as a condition precedent to suit under Section 505 expired on or about August 26, 1989. Accordingly, Texaco should be granted leave of Court pursuant to Rule 15(d) to file a supplemental pleading alleging that 120 days have elapsed since its filing of a tax refund claim with the Board of Tax Appeals and that the exhaustion requirement of Section 505(a)(2)(B), if applicable, therefore has been satisfied.

*The "Jurisdictional Bar" of La.R.S. 47:1481 (Issue Five)*

The State maintains that Texaco cannot proceed with its severance tax overpayment counterclaim in federal court because it is not authorized to do so by La. R.S. 47:1481. The entirety of the State's argument with regard to the effect of La. R.S. 47:1481 is found in a single sentence. The State urges that Section 1481 authorizes a taxpayer to proceed before the Louisiana Board of Tax Appeals but "does not create a claim nor serve as a jurisdictional basis for Texaco to recover against the State in a federal counterclaim."[16] Be that as it may, Section 505 of the Bankruptcy Code quite plainly authorizes a bankruptcy court to determine the amount or legality of any tax "whether or not previously assessed, whether or not paid, and *whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.*" 11 U.S.C. § 505(a)(1) (emphasis added).[17] Under the Supremacy Clause, Section 505(a)(1) provides the Court with all of the authority it needs to determine whether Texaco made overpayments of severance taxes to the

---

16. *Memorandum of the State of Louisiana in Support of Motions under Federal Rule of Civil Procedure 12 and Bankruptcy Rule 7012,* at 9.

17. This authority of course is subject to the exhaustion requirement of Section 505(a)(2)(B), discussed above, which, if applicable, has been satisfied here by virtue of the expiration of the 120 day waiting period.

State and La.R.S. 47:1481 in no sense operates to deprive this Court of that authority. Further, as established above, Section 106(b) of the Bankruptcy Code and 28 U.S.C. § 1334 provide the jurisdictional basis for making this determination in the context of a counterclaim that seeks an offset against any recovery by the State. With Eleventh Amendment and sovereign immunity waived, La.R.S. 47:1481 cannot operate to deprive the Court of this jurisdiction granted to it by Congress. The State's reliance upon La.R.S. 47:1481 as a bar to jurisdiction in this Court therefore is without merit.

*The Effect of the Stipulation Concerning the Louisiana Department Of Revenue Proof of Claim (Issue Six)*

The State further contends—in a reply memorandum—that Texaco is barred from asserting its severance tax overpayment counterclaim in this adversary bankruptcy proceeding by a prior court-approved stipulation pertaining to the expungement of tax claims asserted in the bankruptcy case by the Louisiana Department of Revenue. A review of the agreement in question reveals that the only matters expunged pursuant to the stipulation were certain tax claims filed by the Department of Revenue and Texaco's objections to those tax claims. The stipulation does not purport to expunge or prohibit the assertion of Texaco's later-filed counterclaim regarding its alleged overpayment of severance taxes.

*Failure to State a Claim On Counts Two and Three Under 11 U.S.C. § 505*

Texaco's pleadings on the state law claims asserted in Counts Two and Three of its counterclaims refer to 11 U.S.C. § 505. The State moves to dismiss these state law claims because Section 505 of the Bankruptcy Code has nothing to do with the claims. Texaco acknowledges that its citation to Section 505 on these counts was erroneous and that the section bears no relation to the claims asserted in Counts Two and Three. The State's motion to dismiss on this ground nonetheless is lacking in merit. The Court is not going to dismiss $58.3 million in otherwise viable counterclaims on the basis of an erroneous statutory citation. The State's hypertechnical objection on this point is completely at odds with the letter and spirit of the federal pleadings rules, including the admonition that "[a]ll pleadings shall be so construed as to do substantial justice." Fed.R.Civ. Pro. 8(f); *see generally* 5 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1286, at 383–86 (1969). The State makes no contention that the state law claims asserted in Counts Two and Three fail to state a claim for relief under state law and, accordingly, the State's argument must fail.

*Motion for a More Definite Statement*

The State contends that Texaco should be ordered to provide a more definite statement of its claims under Counts One and Three. Under Rule 12(e) of the Federal Rules of Civil Procedure, a more definite statement of a pleading can be required if the pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed.R. Civ.Pro. 12(e). Motions for a more definite statement are not favored,[18] as "the net result of granting a Rule 12(e) motion simply may be an increase in the time and effort expended in refining the pleadings, with little accomplished in terms of circumscribing the scope of discovery or defining the issues." 5 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1376, at 736 (1969). Accordingly, "the class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small—the pleading ... must be so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself." *Id.,* at 733. Thus, where the pleading is not so vague or ambiguous that the opposing party cannot reasonably respond, a motion for a more definite statement will not be granted to require the pleading of information that can be obtained through dis-

---

**18.** *See, e.g., Scarbrough v. R–Way Furniture Company,* 105 F.R.D. 90, 91 (E.D.Wis.1985); *Thrasher v. Missouri State Highway Comm.,* 534 F.Supp. 103, 106 (E.D.Mo.1981).

covery or other means. *See, e.g., Mitchell v. E–Z Way Towers, Inc.,* 269 F.2d 126, 132 (5th Cir.1959); *Woods v. Reno Commodities, Inc.,* 600 F.Supp. 574, 580 (D.Nev. 1984); *Cotton Brothers Baking Co., Inc. v. Industrial Risk Insurers,* 102 F.R.D. 964, 966–67 (W.D.La.1984); *In re Noroton Heights Enterprises Corp.,* 96 B.R. 11, 15 (Bankr.D.Conn.1989). The decision to grant or deny a motion for a more definite statement is committed to the sound discretion of the trial judge and the district court's ruling on the motion will be set aside only for an abuse of discretion. *Old Time Enterprises, Inc. v. International Coffee Corporation,* 862 F.2d 1213, 1217 (5th Cir.1989); *Mitchell,* 269 F.2d at 130.

The State urges that Rules 9(b) and 12(e) of the Federal Rules of Civil Procedure require a more definite statement of Texaco's claim of error or mistake on its severance tax overpayment counterclaim under Count One. However, Texaco's allegations of error and mistake on Count One of its counterclaim are not so vague or ambiguous that the State cannot reasonably respond to the pleading. On Count One, Texaco has sufficiently specified the circumstances leading to the allegedly erroneous severance tax payments. The Court can understand quite well from the approximately thirty pages of Texaco pleadings on this point that Texaco alleges: (1) that Texaco, based on certain initial representations by the Federal Energy Agency and with the concurrence of the State, treated Louisiana Office of Conservation production units as separate "properties" for purposes of pricing crude oil production under federal price control regulations; (2) that the federal agency retroactively defined the term "property" as the premises described by an oil and gas lease rather than a state regulatory production unit; and (3) that this retroactive regulatory definition resulted in Texaco having charged too much—and consequently having paid too much severance tax—on production that was sold as "new oil" based upon the later-rejected definition of "property". Further pleading adding yet more detail on this point is not necessary.

The State also complains that Counts One and Three are deficient because they do not identify the specific leases, properties, prices, time periods, wells and volumes of production pertaining to the alleged tax and royalty overpayments. The State's motion for a more definite statement with respect to the specific lease contracts and time periods involved might well have some merit were this a garden-variety mineral lease contract dispute involving only a handful of leases. However, this litigation involves claims pertaining to a large number of leases located throughout the State and the pleadings required to set forth those claims have been anything but brief. It would serve no practical purpose in this litigation to order the parties to clog up an already voluminous record with additional pleadings setting forth additional factual detail that can be exchanged as easily between counsel in formal discovery or through other means. A review of Texaco's pleadings leads to the conclusion that Counts One and Three are not so vague or ambiguous for want of this factual detail that the State cannot reasonably respond to the allegations by simply denying them, particularly as the pleading obligations of a party under Rule 11 are based upon the party's knowledge at the time the pleading is signed, based upon what can be ascertained by reasonable investigation at that time.[19] *Cf. Mitchell,* 269 F.2d at 132 ("It is too plain to require elaboration that if the defendants did not in good faith believe that they had violated the act, or that their operations were subject, in whole or in part to the Act, they could say so by denying the allegations in the complaint, and an issue would be drawn."); *Stromillo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*

19. *See Thomas v. Capital Security Services, Inc.,* 836 F.2d 866, 874–76 (5th Cir.1988) (*en banc*) (Rule 11 compliance is judged by the circumstances existing at the time the pleading was signed and the determination of whether a reasonable factual inquiry was made is dependent in a given case upon factors such as the complexity of the legal and factual issues involved and the extent to which discovery is required.)

54 F.R.D. 396, 397–98 (E.D.N.Y.1971) ("Litigants should avoid burdening the courts, themselves and their adversaries with excess paperwork where cheaper and more flexible means exist to accomplish the same objectives."); 5 C. Wright & A. Miller, *supra*, § 1378, at 772 (absent special circumstances, a motion requesting a statement of a substantial number of complex details should not be granted, because of the potential for confusion and delay and because of the availability of a broad discovery procedure); 5 C. Wright & A. Miller, *supra*, § 1377, at 748 ("[T]he movant's ability to prepare a responsive pleading is to be measured in terms of the minimal duty imposed on him by the federal pleading rules....."). Texaco therefore should not be ordered to file additional pleadings supplying information that can be obtained through discovery.

## RECOMMENDATION

Accordingly, for the foregoing reasons, it is the recommendation of the Magistrate that the State's motion be DENIED.