**In re 995 FIFTH AVENUE ASSOCIATES, L.P., Debtor.**

**995 FIFTH AVENUE ASSOCIATES, L.P., Plaintiff,**

v.

**NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, James W. Wetzler as Commissioner of Taxation and Finance, and Edward V. Regan as Comptroller of the State of New York, Defendants.**

Bankruptcy No. 88 B 10237(TLB). Adv. No. 89–5449A.

United States Bankruptcy Court, S.D. New York.

July 13, 1990.

Angel & Frankel, P.C. by Joshua J. Angel, Leonard H. Gerson, Ira R. Abel, New York City, for debtor.

Robert Abrams, Atty. Gen. by David Cook, Marcie Mintz, New York City, for defendants.

## DECISION GRANTING MOTION FOR SUMMARY JUDGMENT

TINA L. BROZMAN, Bankruptcy Judge.

At issue in this adversary proceeding is whether section 1146(c) of the Bankruptcy Code, 11 U.S.C.A. § 1146(c) (West Supp. 1990) (Section 1146(c)) exempts a debtor in possession from payment of the tax imposed on the gains derived from the transfer of real property within the State of New York pursuant to N.Y.Tax Law § 1441 (McKinney 1987) (the Gains Tax). 995 Fifth Avenue Associates, L.P. (the Debtor), the debtor in this chapter 11 case, moves for summary judgment arguing that Section 1146(c) does apply and that the $2,608,603.80 Gains Tax payment it made under protest should be returned. The New York State Department of Taxation and Finance (the Tax Department), James W. Wetzler as Commissioner of Taxation and Finance, and Edward V. Regan as Comptroller of the State of New York (collectively, New York) have cross-moved for summary judgment to dismiss for failure to state a claim, arguing that the Section 1146(c) exemption does not apply and that the Eleventh Amendment and the doctrine of sovereign immunity are complete defenses to the adversary proceeding. For the reasons set forth below, I conclude that Section 1146(c) does exempt the Debtor from liability for the Gains Tax and that neither the Eleventh Amendment nor the doctrine of sovereign immunity precludes entry of judgment against New York be-

cause it filed a proof of claim relating to the Gains Tax after it interposed its claim of immunity.

## I. Background

The salient facts are largely undisputed. The Debtor filed its Chapter 11 petition on February 4, 1988. Its business was the operation of a hotel and related restaurant and catering facilities known as the Stanhope Hotel (the Stanhope), a business which the Debtor continued to operate as debtor in possession. Over the course of the bankruptcy case, the Debtor filed an original and three subsequent amended plans of reorganization (collectively, the Plan), all of which contemplated the sale of the Debtor's interest in the Stanhope. On July 20, 1989, the Plan was confirmed.

Prior to confirmation and by order dated November 29, 1988 (the Sale Order), I authorized the Debtor to sell and/or assume and assign its interest in the Stanhope for $76,000,000. The Sale Order declared that the sale was being made under a plan of reorganization and, pursuant to Section 1146(c), would be exempt from any federal, state, or local transfer taxes. The closing of the sale was scheduled for January 13, 1989. On January 12, pursuant to the pre-transfer audit procedures provided by N.Y.Tax Law § 1447 (McKinney 1987), New York issued a Tentative Assessment and Return imposing a Gains Tax of $2,608,603.80 on the proposed sale and transfer. Citing the relevant provisions of the Sale Order and Section 1146(c), the Debtor requested but was denied an exemption from the Gains Tax. Because state law prohibits recordation in the local land records without payment of any tax due under the Tentative Assessment and Return, the Debtor paid the Gains Tax under protest to allow the deed to be recorded and the sale to close the following day. N.Y.Tax § 1447, subd. 1(f) (McKin-

ney 1987). Since the filing of the petition, New York has filed claims against the Debtor's estate based on both pre and post-petition tax obligations, with the most recent amended claim including a liability for the Gains Tax.[1]

## II. The 1146(c) Exemption

■ Section 1146(c) provides:
The issuance, transfer, or exchange of a security or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.

For the exemption from tax liability to apply, a three pronged test must be fulfilled: 1) the tax must be a stamp or similar tax; 2) imposed upon the making or delivery of an instrument transferring an interest in real property; and 3) in connection with a confirmed bankruptcy plan. *In re The Baldwin League of Independent Schools*, case No. 88 B 10401(CB) (June 21, 1988) (oral op.), *aff'd*, 110 B.R. 125 (S.D.N.Y.1990). The major challenge in this case is the satisfaction of the first prong, that is, whether the Gains Tax qualifies as a stamp or similar tax. New York relies almost exclusively on the bankruptcy court's decision in *In re Jacoby–Bender, Inc.*, 40 B.R. 10 (Bankr.E.D.N.Y.1984), *aff'd mem.*, No. 84–1564 (E.D.N.Y. Sept. 18, 1984), *aff'd*, 758 F.2d 840 (2d Cir.1985), which held that the Gains Tax was not exempt under Section 1146(c). So much of the bankruptcy court's decision as dealt with the Gains Tax was never appealed.

In *Jacoby*, the debtor sought an order exempting it from payment of the New York City Real Estate Transfer Tax, the New York State Real Estate Transfer Tax (collectively the Transfer Taxes) and the New York State Capital Gains Tax, the same Gains Tax presently in issue. The

---

**1.** New York filed an amended claim dated October 23, 1989 which it designated as "3rd Amended Administrative Expense" (claim number 300 on the Clerk of the Court's claims docket). The cover sheet attached to claim number 300 indicates that the amendment is based in part "on the addition of Gains Tax Liability" with the text of the claim referencing the statutory provision imposing the tax. Claim number 300 was filed after I heard oral argument on the summary judgment motions and after the parties submitted post-trial memoranda in support of their respective positions. In light of New York's voluntary submission to my jurisdiction, most of its challenges to my ability to grant the relief sought by the Debtor have evaporated.

*Jacoby* court inquired into the meaning of the phrase "stamp or similar tax" but found no legislative history or court decisions directly construing Section 1146(c) or its precursors. It reasoned that two essential characteristics of stamp taxes are that the amount of tax is usually determined by the consideration recited in the deed of transfer and that the taxes must be paid as a prerequisite to recording. Other characteristics of lesser importance to the court's analysis included the use of stamps as visible evidence that the tax had been paid (deemed not "crucial" to the purpose served by the statutory exemption) and the "technical" feature that stamp taxes are charged on written instruments recognized in law as evidence of the enforcement of legal rights. *Jacoby*, 40 B.R. at 13; *see also In re Amsterdam Ave. Dev. Assoc.*, 103 B.R. 454, 456–57 (Bankr.S.D.N.Y.1989) (citing *Jacoby*). Further, the *Jacoby* court noted that stamp taxes are similar to excise taxes, which are generally imposed upon the sale or use of certain articles and on certain transactions.

Carefully examining the characteristics of the Transfer Taxes, the court held them to fall within the purview of Section 1146(c). It noted that the amount of the Transfer Taxes is determined by the consideration or value of the property conveyed; that payment of the taxes is a precondition to recording; that recordation of the deed is "clear and convenient evidence" of payment of the Transfer Taxes so that affixing stamps to the instrument of transfer is not necessary; and that the Transfer Taxes are taxes upon deeds recognized in law as important evidence of legal rights.

When considering the possible exemption from the Gains Tax, the *Jacoby* court did not address any of the characteristics it so meticulously reviewed with regard to the Transfer Taxes. Rather, the court found that the only similarity between the Gains Tax and taxes exempt under Section 1146(c) is that both are imposed at the time of transfer. Without further ado, the court held that the Gains Tax was an in-

come tax rather than an excise tax, because it was levied only upon the gain realized by the debtor and not upon the instrument of transfer. The court stated that unlike the Gains Tax, all of the stamp taxes it had previously discussed were imposed regardless of whether the transferor gained or lost money on the transaction. With good reason, New York relies on *Jacoby*, emphasizing that the *Jacoby* holding has been codified in the New York State tax regulations. *See* N.Y.Comp.Codes R. & Regs. tit. 20, § 590.65 (1988).

■ Although the *Jacoby* debtor appealed the unfavorable determination regarding the Gains Tax, New York State subsequently stipulated to return the Gains Tax payment,[2] thereby mooting appellate review. Accordingly, the decision is not binding precedent as to the Gains Tax. Of lesser precedential value is the incorporation of the *Jacoby* result in the tax regulations of the State of New York; the reach of Section 1146(c) is a federal question to be resolved by defining the scope of federal law. *See Amsterdam*, 103 B.R. at 458 (citing *United States v. L.N. White & Co.*, 359 F.2d 703, 714 n. 16 (2d Cir.1966)). Moreover, where a state tax has an impact upon a federal right, federal courts are not only free to, but must, look beyond the label affixed by the state to determine the nature of the tax and its effect on the federal right. *Amsterdam*, 103 B.R. at 458 (citing *Carpenter v. Shaw*, 280 U.S. 363, 367–68, 50 S.Ct. 121, 122–23, 74 L.Ed. 478 (1930)). It is therefore entirely appropriate to analyze the Gains Tax in light of *Baldwin League*'s three pronged test for an exemption under Section 1146(c).

The amount of the Gains Tax is determined by adding statutorily permitted adjustments (including certain capital improvements and fees paid to brokers, surveyors, engineers and attorneys) to the transferor's original purchase price and then subtracting that amount from the consideration received for the transfer. *See*

---

**2.** The parties here dispute the circumstances leading to the stipulation. That dispute is wholly irrelevant.

*generally* N.Y.Tax Law § 1440(5) (McKinney 1987); 20 N.Y.Comp.Codes R. & Regs., §§ 590.14–17 (1988). When the consideration paid for the transfer exceeds the adjusted original purchase price, a gain is realized upon which a ten percent tax is levied. Thus, the consideration paid to the transferor and recited in the instrument of transfer plays an essential role in assessing the Gains Tax due. For all intents and purposes, the Gains Tax must be paid at the time of transfer, as state law prohibits the recording of the conveyance until this act is done. *See* N.Y.Tax Law § 1447, subd. 1(f) (McKinney 1987). Recording the instrument of transfer provides evidence that the Gains Tax has been paid; without recordation, valuable legal rights are forfeited. *See* N.Y. Real Property Law § 291 (McKinney 1989) (any conveyance of real property not recorded is void against a subsequent purchaser who acquires property in good faith and for valuable consideration). Thus, the Gains Tax, like the Transfer Taxes discussed in *Jacoby*, seemingly shares both the essential and technical characteristics of a stamp or similar tax.

New York urges that *Jacoby* correctly classified the Gains Tax as an income tax rather than a transfer tax subject to exemption under Section 1146(c). The word "income" when used in relation to statutory provisions regarding income taxes must be given its plain and ordinary meaning. 71 Am.Jur.2d, *State and Local Taxation* § 483 at 784 (2d ed. 1973).

> In its ordinary and popular meaning, "income" is the amount of actual wealth which comes to a person *during a given period of time.... The word in most if not all connections involves time as an essential element in its measurement or definition.* It thus is differentiated from capital or investment, which commonly means the amount of wealth which a person has on a fixed date.

*Id.* at 784, n. 75 (emphasis added) (citation omitted). *See also Black's Law Dictionary* 687 (5th ed.1979) (income is "[t]he

true increase in amount of wealth which comes to a person during a stated period of time"). *Compare Black's Law Dictionary* 1343 (5th ed.1979) (transfer tax defined as a "[t]ax upon passing of title to property", implying an isolated transaction rather than transactions over a period of time). Indeed, New York's personal income tax provisions are based on a period of time designated as each taxpayer's "taxable year." *See* N.Y. Tax Law § 601 et seq. (McKinney 1987). The Gains Tax, however, is imposed on a transaction by transaction basis, payable on the transfer, without regard for any other transfers made over a given period of time. A taxpayer can make two transfers on the same day, one earning $1,000,000 and the other losing $1,000,000 so that at the end of the day he realizes no increase of wealth as ordinarily contemplated under an income tax scheme. Yet the taxpayer would be liable for the Gains Tax on the isolated, profitable transaction and could not offset his losses on the unprofitable transaction. This is certainly a result more in line with the imposition of a transfer tax than an income tax.

The Tax Department has in other contexts expressly defined the Gains Tax as a transfer tax and distinguished it from an income tax.[3] Specifically, the Tax Department issued two opinion letters addressing taxpayer inquiries into treatment of the Gains Tax for income tax purposes. The first of these letters, dated September 21, 1983, unequivocally stated:

> The State gains tax is a transfer tax rather than a property or income tax since the triggering mechanism of the tax is the transfer of real property. Whereas the gains tax is a tax upon the transfer of real property, a property tax is a levy on the property itself. Income taxes are generally applied to net gain. Under the gains tax, the loss from one transfer of real property does not effect the applicability of the gains tax to another transfer of real property in the same tax year. For these reasons, it is our opinion that the State gains tax

---

**3.** Unremarkably, the contradictory constructions of the Gains Tax have the effect of increasing the taxpayer's liability in each instance.

should be classified as a State transfer tax and should be treated as such for purposes of deductibility.

The letter made reference to a revenue ruling issued by the Internal Revenue Service (the IRS) which held that a similar gains tax imposed by the State of Vermont was a transfer tax and not an income tax. In Revenue Ruling 80–121, the IRS explained that for federal income tax purposes, taxpayers were allowed to reduce gains from the sale of land by any losses incurred on the sale of other land during the taxable year. Rev.Rul. 80–121, 1980–1 C.B. 44. The Vermont tax, however, made no provision to offset gains from profitable real estate transactions against losses on unprofitable transactions and was deemed to be a tax on a particular transfer rather than on income. Noting that New York State tax policy is usually formulated in accordance with federal treatment of a tax, the opinion letter adopted this "net gain" analysis and determined that the Gains Tax was a transfer tax and thus not fully deductible against income. The second opinion letter, dated November 14, 1983, basically reiterated this position.[4] The Tax Department incorporated the conclusions of the two opinion letters, including their review of Rev.Rul. 80–121, into its official publication explaining the Gains Tax. *See* NYS Department of Taxation and Finance, Questions and Answers–Gains Tax on Real Property Transfers, Publication 588 at 27 (November 1984).

Although such advisory opinions are not binding on New York with respect to this debtor, *see* 20 N.Y.Comp.Codes R. & Regs. § 901.4 (1988), the letters are no less instructive and directly on point. Never has New York argued that the opinion letters were mistaken or that it has subsequently changed its treatment of the tax for allocability of deductions. When asked at oral argument to reconcile the transfer tax analysis found in the opinion letters with its current position that the Gains Tax is an income tax, New York responded simply that the tax could be treated differently for

different purposes. While that is undoubtedly true, New York's two positions are diametrically opposed with no articulated basis for the differing treatment of the same tax.

There are other factors which indicate that the Gains Tax is assessed on the transfer of real property rather than on the income generated thereby. First, the "original purchase price" for Gains Tax purposes is not adjusted to reflect depreciation of the real property transferred. Without an adjustment for depreciation, the Gains Tax is not based on a true measure of the transferor's accrued wealth as it would be for calculating the gain for income tax purposes. Second, the fact that the Gains Tax is not assessed against all profitable transactions undercuts the New York's argument that it is an income tax. Only transfers in which the consideration exceeds $1,000,000 are subject to the Gains Tax; once this cap is met the entire gain is taxed, not merely that portion exceeding $1,000,000. Thus, the Gains Tax is levied upon a certain class of transfers and not on a certain class of income. Further support for this theory is found in the fact that profitable transactions of less than $1,000,000 within a taxable period are subject to income tax but not the Gains Tax. Finally, in the event the transferor does not pay the Gains Tax, the transferee becomes personally liable for the tax. N.Y.Tax Law § 1447(3) (McKinney 1987); 20 N.Y.Comp. Codes R. and Regs., § 590.70 (1988). It is abundantly clear that the ultimate goal of the Gains Tax is not to tax the transferor's *income* but rather to tax any *transfers* in which he is involved.

The fact that Gains Tax is imposed only upon profitable transfers does not dictate that it is unlike a stamp or similar tax. The *Jacoby* court found this to be a distinguishing feature, noting that all of the stamp taxes it had reviewed were imposed "regardless of whether the transferor gained or lost money in the transaction involved." 40 B.R. at 15. However, the

---

**4.** The court in *Jacoby* did not discuss and may not have had the benefit of these opinion letters at the time it rendered its decision. Copies of

the letters are attached as an appendix to this decision.

Supreme Court has held it constitutional to impose stamp taxes on certain classes of transactions even though others are exempt from tax. *Brodnax v. Missouri,* 219 U.S. 285, 31 S.Ct. 238, 55 L.Ed. 219 (1911); *accord,* 71 Am.Jur.2d, *State and Local Taxation* § 638 at 894 (2d ed.1973). For all these reasons, I am convinced that the Gains Tax shares the most important characteristics of a stamp or similar tax and that it meets the first prong to qualify for an exemption.

The Gains Tax also satisfies the second precondition for exemption under Section 1146(c). The Gains Tax is due at the time of conveyance and therefore is imposed upon the making or delivery of an instrument of transfer. New York argues that although the timing is identical, the Gains Tax is not imposed on the deed or transfer but rather on the gain realized. *See also Jacoby,* 40 B.R. at 15. This is similar to the argument rejected in *Federal Land Bank v. Crossland,* 261 U.S. 374, 43 S.Ct. 385, 67 L.Ed. 703 (1923), where the Supreme Court found that a tax on recording a mortgage was equivalent to a tax on the mortgage itself. *See also Amsterdam,* 103 B.R. at 457–58 (rejecting the argument that a mortgage tax was tax on the "privilege" of recording and not on the mortgage itself). In essence, New York's argument is that the tax is upon the privilege of realizing a gain and not on the transfer itself. However, as with the mortgage taxes discussed above, unless the Gains Tax is paid, the deed or instrument will not be recorded and valuable legal rights will be forfeited.

Few purchasers of real property will commit themselves to transactions under these conditions, making recordation an integral component of the conveyance. *Amsterdam,* 103 B.R. at 458. For our purposes, then, the Gains Tax is analytically a tax on the transfer, and hence a tax on the instrument of transfer, notwithstanding New York's characterization of the prepayment requirement as merely a practical mode of collecting an income tax.

That the final prong of the *Baldwin League* test has been satisfied is undisputed here. The sale of the Stanhope was made pursuant to a subsequently confirmed plan of reorganization under chapter 11 of the Bankruptcy Code as required by Section 1146(c). Accordingly, the Gains Tax which the Debtor paid under protest was not due.

## III. Waiver of Sovereign Immunity

 Having found the Section 1146(c) exemption to apply, I must next determine whether the Eleventh Amendment or the doctrine of sovereign immunity precludes the exercise of jurisdiction over New York.[5] There are two well known exceptions to the doctrine of sovereign immunity and the Eleventh Amendment which allow a plaintiff to assert a claim against a state in federal court.[6] These exceptions, which can be labeled "waiver by participation" and "waiver by abrogation" are both premised on Congressional legislation and are discussed below.

---

5. There is a technical distinction between common law sovereign immunity and the constitutional protections of the Eleventh Amendment. Sovereign immunity protects a state from a suit brought by one of its own citizens; a waiver of sovereign immunity goes to "whether" or "when" a state may be sued. The Eleventh Amendment prohibits suits against the several states in federal court and thus speaks to "where" a state may be sued. *See Lawson Burich Assoc., Inc. v. Axelrod (In re Lawson)* 59 B.R. 681, 687 n. 8 (Bankr.S.D.N.Y.1986). The distinction is not crucial to this decision, as the Second Circuit has held that the waiver intended under section 106 encompasses both sovereign immunity and the protections of the Eleventh Amendment. *See Hoffman v. Connecticut Dep't of Income Maintenance, (In re Willington*

*Convalesence Homes, Inc.)* 850 F.2d 50, 56 n. 6 (2d Cir.1988), *aff'd* — U.S. ——, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989).

6. A state may also waive its immunity to private causes of action in federal court by enacting its own state statute or constitutional provision, provided the enactment does so in express and unmistakable language. *See Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 *reh'g denied* 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974); *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909). New York State has enacted no such statute governing this adversary proceeding.

## A. WAIVER BY PARTICIPATION

■ Waiver by participation occurs when a state engages in a federally sponsored activity in which Congress has made waiver of immunity a necessary condition of state participation. *See Parden v. Terminal Railway of the Alabama State Docks Dep't*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), *overruled in part, Welch v. Texas Dep't of Highways and Public Transp.*, 483 U.S. 468, 478, 107 S.Ct. 2941, 2948, 97 L.Ed.2d 389 (1987).[7] However, before this can occur, the language of the congressional enactment must manifest "a clear intent to condition participation ... on a State's consent to waive its constitutional immunity." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 237, 105 S.Ct. 3142, 3144, 87 L.Ed.2d 171 (1985), *reh'g denied* 473 U.S. 926, 106 S.Ct. 18, 87 L.Ed.2d 696 (1985). Mere participation by a state is inadequate, as "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights...." *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1360; *accord WJM, Inc. v. Massachusetts Dep't of Public Welfare*, 840 F.2d 996, 1002 (1st Cir.1988). By using unequivocal language, Congress places a state on notice of the consequence of its participation. Clear notice is required because, although bottomed on a congressional enactment, "the loss of immunity ultimately is grounded in waiver and consent by the State through conduct." *Texaco, Inc. v. Louisiana Land and Exploration Co.*, 113 B.R. 924, 933 (M.D.La.1990).

The waiver of a state's immunity by its participation in a bankruptcy proceeding has long been recognized, not only under the Code, but under the former Bankruptcy Act as well. In *Clark v. Barnard*, 108 U.S. 436, 447–48, 2 S.Ct. 878, 882–84, 27 L.Ed. 780 (1883) the state was deemed to have waived any Eleventh Amendment immunity when it intervened and asserted a claim to the fund in controversy. Similarly, in *Gardner v. New Jersey*, 329 U.S. 565, 574–75, 67 S.Ct. 467, 472–73, 91 L.Ed. 504 (1947), *reh'g denied* 330 U.S. 853, 67 S.Ct. 768, 91 L.Ed. 1296 (1947), the Court applied the traditional rule that a state which invokes the aid of the bankruptcy court subjects itself to and must abide by the procedures of that court. The Court went on to hold that by filing a proof of claim and seeking its allowance, the "State becomes the actor ... [and] waives any immunity which it otherwise might have had respecting the adjudication of the claim." *Id.* at 574, 67 S.Ct. at 472 (citations omitted). The *Gardner* Court held that in light of the state's participation, there was no collision between Section 77 of the former Bankruptcy Act and the constitutional protections of sovereign immunity. *Id.* More recently, this well established exception to sovereign immunity has been codified in Section 106(a) of the Bankruptcy Code, which was enacted "to prevent a government unit from receiving a 'distribution from the estate without subjecting itself to any liability it has to the estate' arising from the same transaction or occurrence upon which its right to distribution is based." *Prudential Lines, Inc. v. United States Maritime Admin. (In re Prudential Lines, Inc.)*, 79 B.R. 167, 180 (Bankr.S.D.N.Y.1987) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 317 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 29–30 (1978) *reprinted in* 1978 U.S.Code Cong. & Adm. News 5787, 5815–16, 6274). *See also West Virginia v. Hassett (In re O.P.M. Leasing Serv., Inc.)*, 21 B.R. 993, 1001 (Bankr.S.D.N.Y.1982); *Texaco v. Louisiana Land and Exploration Co.*, 113 B.R. at 934; *Saint Joseph's Hosp. v. Department of Public*

---

7. In *Welch*, a four justice plurality, joined by a fifth justice concurring in part, overruled *Parden v. Terminal Railway* to the extent it held that Congress could statutorily abrogate Eleventh Amendment immunity through something less than unmistakably clear language. The *Welch* decision, however, did not upset *Parden's* holding that a state's participation in a federal program could give rise to a waiver of immunity. In fact a plurality of the Court has subsequently indicated its acceptance of this principle by stating "[a] State may effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, *or by otherwise waiving its immunity to suit in the context of a particular federal program.*" *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 3145 n. 1, 87 L.Ed.2d 171 (1985) (emphasis added).

*Welfare (In re Saint Joseph's Hospital)*, 103 B.R. 643, 650 (Bankr.E.D.Pa.1989); *In re Lile*, 96 B.R. 81, 83–84 (Bankr.S.D.Tex. 1989).

## B. WAIVER BY ABROGATION

■ Notwithstanding participation and consent by a state, Congress can abrogate or override Eleventh Amendment immunity by enacting a statute under certain of its plenary powers granted by the Constitution. As with waiver by participation, Congress may abrogate a state's constitutionally secured immunity "only by making its intention unmistakably clear in the language of the statute." *Atascadero*, 473 U.S. at 242, 105 S.Ct. at 3147; *Dellmuth v. Muth*, —— U.S. ——, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (citations omitted). Thus, in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court found that Congress had the authority to abrogate a state's Eleventh Amendment immunity when legislating pursuant to Section 5 of the Fourteenth Amendment. Congress can also abrogate a state's immunity when it enacts statutes pursuant to its Article I powers under the Commerce Clause. *See Pennsylvania v. Union Gas Co.*, —— U.S. ——, 109 S.Ct. 2273, 2277, 105 L.Ed.2d 1 (1989). In *Hoffman v. Connecticut Dep't of Income Maintenance*, —— U.S. ——, 109 S.Ct. 2818, 2824, 106 L.Ed.2d 76 (1989), the Supreme Court had the opportunity, but expressly declined, to decide whether Congress, under the Bankruptcy Clause of Article I, had the authority to abrogate a state's immunity by enacting section 106 of the Bankruptcy Code.

In *Hoffman*, the State of Connecticut had not filed any claims against the debtor's estate, precluding waiver by participation. The debtor, who sought to recover a money judgment against Connecticut, relied on section 106(c) of the Bankruptcy Code which "binds" governmental units to determinations made by the court. The Supreme Court found, however, that the language of section 106(c) did not make it unmistakably clear that Congress intended to subject a state to monetary recovery (as opposed to declaratory or injunctive relief)

when it had not filed a proof of claim. 109 S.Ct. at 2823. Because it found the requisite language of waiver absent, the Court declined to address whether Congress had the authority under the Bankruptcy Clause to abrogate a state's immunity. *Id.* at 2824; *see also Union Gas*, 109 S.Ct. at 2277 (if statutory language does not contain clear expression of intent, constitutional question of Congress's authority to abrogate immunity need not be considered).

## C. WAIVER OF IMMUNITY IN THIS PROCEEDING

■ Before applying the concepts of waiver by participation and waiver by abrogation, I must note that the validity of any distinction between the two theories has been called into question. In his dissent in *Union Gas*, Justice Scalia discussed the waiver by participation theory espoused in *Parden v. Terminal Railway* and stated:

to acknowledge that the Federal Government can make the waiver of state sovereign immunity a condition to the State's action in a field that Congress has authority to regulate, is substantially the same as acknowledging that the Federal Government can eliminate state sovereign immunity in the exercise of its Article I powers ...

*Union Gas*, 109 S.Ct. at 2303 (Scalia, J., dissenting) (footnote omitted). To Justice Scalia, there was no more than a semantical difference between saying that Congress abrogated Eleventh Amendment immunity in suits based on certain activity or that the State's participation in that activity constituted a waiver of its privilege. Under either label, Justice Scalia asserted, Congress was attempting to accomplish the same goal of using its Article I powers to circumvent the bar imposed by the Eleventh Amendment. Being of the opinion that Article I does not grant Congress that authority, Justice Scalia maintained neither waiver by participation nor abrogation could be relied on to subject a state to a private cause of action in federal court. *See also Hoffman*, 109 S.Ct. at 2824 (Scalia, J., dissenting) (Congress does not have the authority under the Bankruptcy Clause

to override a state's sovereign immunity). Although adopted by several other Justices, Justice Scalia's view did not command a majority of the Court in either *Union Gas* or *Hoffman*, and thus does not disturb the authority relied on in this decision. *See also Texaco v. Louisiana Land*, 113 B.R. at 935.

The federal statute which furnishes the grounds for waiver of New York's immunity is Section 106 of the Bankruptcy Code. Section 106 provides in pertinent part:

Waiver of sovereign immunity

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

(b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

In their brief and oral argument, both parties focused on the language of section 106(b) and its provisions for offsetting unrelated claims, because New York had not as of that time filed a claim for the Gains Tax. But New York subsequently filed amended claim no. 300, which includes a request for Gains Tax liability and penalties and interest accruing from January 13, 1989 to September 23, 1989. The focus of the waiver argument therefore shifts from section 106(b) to section 106(a), which deals with claims filed by a state arising out of the same transaction for which a debtor seeks monetary recovery.

Consideration of New York's subsequently filed claim is appropriate, as "[w]aivers ... often control past events." *WJM v. Massachusetts*, 840 F.2d at 1004. In *WJM*, the circuit court discovered that the State of Massachusetts filed related proofs of claim three months after the bankruptcy court heard oral argument but before judgment was entered in the debtor's adversary proceeding seeking a money judgment from the state. It was unclear from the record below whether either the bankruptcy court or the district court on appeal was aware of the related claims having been filed. The circuit court, in response to Massachusetts' Eleventh Amendment defense, held that the subsequent filing of the proofs of claim was tantamount to a declaration by the state that it had waived immunity to suit in federal court. *Id.* at 1004. The *WJM* court further justified consideration of claims not included in the record below because the issue of sovereign immunity touched upon the jurisdictional scope of appellate court review. Given the likelihood of appeal in a suit of this financial magnitude and the precedent it will set, these same concerns warrant consideration of New York's subsequently filed claim for the Gains Tax.

In no more plain language than it used could Congress have expressed its intention to condition New York's participation and receipt of a distribution in the Debtor's bankruptcy case on a waiver of immunity. By captioning the section "Waiver of Sovereign Immunity", Congress made a direct textual reference to its intent. The Supreme Court, in *dicta*, acknowledged that the language of section 106(a) is carefully crafted to waive sovereign immunity when the state files a proof of claim related to the transaction in controversy. *Hoffman*, 109 S.Ct. at 2822 (plurality opinion); *accord, WJM*, 840 F.2d at 1003 (Section 106(a) gives notice that by choosing to file a claim and enter the bankruptcy court's exclusive domain, a state must pay the price of waiving immunity).

Similarly, Congress's intent to abrogate immunity under its Article I powers is beyond serious question, as section 106(a) applies to a very narrow class of entities deemed "government units," which are defined essentially as the federal government, a state or other foreign or domestic government and their agencies. 11 U.S.C.A. § 101(26) (West Supp.1990). The statute does not authorize suit against *any* potential litigant but addresses only three classes of sovereigns, thereby distinguishing section 106(a) from the overly broad statutes which have been found not to waive immunity. *Compare Atascadero*, 473 U.S. at 246, 105 S.Ct. at 3149 (no waiver of immunity in statute providing mone-

tary damages against "any recipient of Federal assistance"); *Employees of the Dep't of Public Health and Welfare v. Missouri,* 411 U.S. 279, 283, 93 S.Ct. 1614, 1617, 36 L.Ed.2d 251 (1973) (statute allowing suit against "any employer" did not subject state to private cause of action in federal court) *with Union Gas,* 109 S.Ct. at 2278 (statute's express inclusion of "States" within its definition of "Persons" liable for environmental cleanup costs conveyed message of unmistakable clarity that immunity had been waived).

New York cannot and has not contended that the wording of section 106(a) provides inadequate notice of Congress's intent to condition participation on waiver or to abrogate a state's immunity when a related claim is filed, as no other plausible reading exists. Indeed, New York has conceded that a state can waive its immunity by participating in a bankruptcy proceeding. In its supplemental memorandum of law in support of its motion to dismiss, at p. 14, New York cites to *Gardner v. New Jersey,* 329 U.S. 565, 573, 67 S.Ct. 467, 471, 91 L.Ed. 504 (1947) for the proposition that section 106(a) incorporates the traditional bankruptcy rule that waiver by participation occurs when a state files a proof of claim and demands its allowance. New York admitted, before it filed its claim for the Gains Tax, that it had consented to the adjudication of those taxes for which it had already filed proofs of claim. Supplemental memorandum at 15. This concession, coupled with the subsequent filing of an amended proof of claim for the Gains Tax, is enough to defeat New York's immunity defense. It is therefore unnecessary to reach the constitutional questions which New York had propounded before it filed its amended claims. Similarly, in light of the applicability of section 106(a), I need not address the other statutory grounds which the Debtor asserts as sufficient jurisdictional underpinning to effect a setoff under section 106(b). Accordingly the Debtor's motion for summary judgment is granted and New York is directed to refund the Gains Tax payment made under protest. New York's cross-motion for summary judgment for failure to state a claim is denied.

SETTLE ORDER consistent with this decision.

## APPENDIX

State of New York

Department of

Taxation and Finance

Albany, New York 12227

Law Bureau

State Campus,

Albany, New York 12227

September 21, 1983

Dear :

This letter is in reply to your inquiries of June 9 and June 27, 1983 concerning Article 31–B of the Tax Law, the New York Real Property Transfer Gains Tax. You had questions as to the treatment of the tax for State corporate franchise and personal income tax purposes, and as to how the "acquisition of controlling interest" provisions of the tax are to be applied.

In order to determine the deductibility of the gains tax for corporate franchise and personal income tax purposes, the tax must first be classified. The New York State Real Property Transfer Gains Tax is a levy on gains derived from the transfer by any method of an interest in real property located in New York where the consideration is one million dollars or more.

The State gains tax is a transfer tax rather than a property or income tax since the triggering mechanism of the tax is the transfer of real property. Whereas the gains tax is a tax upon the transfer of real property, a property tax is a levy on the property itself. Income taxes are generally applied to net gain. Under the gains tax, the loss from one transfer of real property does not effect the applicability of the gains tax to another transfer of real property in the same tax year. For these reasons, it is our opinion that the State gains tax should be classified as a State

transfer tax and should be treated as such for purposes of deductibility.

It should be noted, however, that though the Department's views are expressed herein, the Internal Revenue Service will ultimately determine the deductibility of the gains tax for Federal tax purposes, and that State tax policy is usually formulated in accordance with the Federal treatment of the tax. It is our opinion, in light of Revenue Ruling 80–121, that the Internal Revenue Service will classify the gains tax as being a transfer tax. In that ruling, Vermont's land gains tax, as imposed by sections 10001 through 10010, Title 32, of the Vermont Statutes Annotated, was deemed to be a transfer tax. The Vermont land gains tax is conceptually similar to New York's gains tax in that the Vermont statute levies a tax on gain from the sale or exchange of land. Under their statute, a sale or exchange of land is any transfer of title to land for a consideration, and taxable gain is the amount realized from a sale or exchange of land, less the transferor's basis in the land.

Section 164(a) of the Internal Revenue Code describes various types of taxes that are allowed as a deduction for the taxable year within which paid or accrued. Specifically allowed are: (1) State and local real property taxes; (2) State and local personal property taxes; (3) State and local income taxes; and (4) State and local general sales taxes. Section 164(a) of the Code also allows, as a deduction, State and local taxes not specifically described that are paid or accrued within the taxable year in carrying on a trade or business or an activity described in section 212 (relating to expenses for the production of income).

In determining that the Vermont land gains tax is a transfer tax, Revenue Ruling 80–121 first distinguished other forms of taxes as not being applicable. The Ruling provides, in pertinent part, as follows:

"The Vermont land gains tax is not imposed or triggered by the ownership of real property, but rather, by the exercise of one of the incidents of property ownership, the transfer of real property at a gain. The land gains tax is not measured by the value of the real property, but rather, by the gain derived from the transfer of that property.... Thus, the land gains tax is not a real property tax within the meaning of section 164(a)(1) of the Code."

With respect to the Vermont land gains tax qualifying as a State income tax within the meaning of section 164(a)(3) of the Code, the Revenue Ruling distinguishes the land gains tax from Federal income taxes, stating that the State tax, unlike the Federal income tax, is not structured to fall on net gain. The taxpayer, as a result of the gains tax, cannot reduce taxable gain from sales or exchanges of land during the taxable year by any losses from other sales or exchanges of land during that year. Under Federal income tax law, taxpayers are allowed to reduce gains from sales or exchanges of land by losses from sales or exchanges of land. Noting that a taxpayer could be required to pay the land gains tax even though under Federal income tax laws that same taxpayer may have a net loss from sales or exchanges of land, the ruling concluded that the tax is not an income tax under section 164(a)(3) of the Code.

In light of Revenue Ruling 80–121, it is the Department's opinion that the New York State Real Property Transfer Gains Tax is a transfer tax, and for purposes of Federal deductibility, the tax is deductible for purposes of computing adjusted gross income under section 164(a) of the Internal Revenue Code only to the extent that it is paid or accrued within the taxable year in carrying on a trade or business, or in connection with an activity described in section 212 of the Internal Revenue Code relating to expenses for the production of income.

For State income tax purposes, section 612 of the Tax Law provides that the New York adjusted gross income of a resident individual means his Federal adjusted gross income, with certain modifications. Since the State gains tax will be deductible for purposes of computing Federal adjusted gross income, it will automatically be excluded from the computation of New York adjusted gross income, since there is

no provision in the Tax Law adding back such amounts for purposes of such computation. A similar provision is found in Article 9–A of the Tax Law, the corporate franchise tax. Section 208 defines "entire net income" to mean total net income from all sources, which shall be presumably the same as the entire taxable income which the taxpayer is required to report to the United States Treasury Department. Since the State gains tax will be deducted from the taxable income the taxpayer is required to report to the United States Treasury Department, the tax will automatically be excluded from the computation of the state franchise tax since there is no provision adding it back for purposes of computing entire net income.

With regard to your inquiry as to how the acquisition of controlling interest provisions of the tax are to be applied, one must look to what is acquired, not to what is maintained. The tax is imposed on gains from the transfer of any interest in real property, which is defined to include "acquisition of a controlling interest" in any entity with an interest in real property. (Tax Law, § 1440.7) The term "controlling interest" is defined in section 1440.2 of the Tax law to mean:

"(i) in the case of a corporation, either fifty percent or more of the total combined voting power of all classes of stock of such corporation, or fifty percent or more of the capital, profits or beneficial interest in such voting stock of such corporation, and

(ii) in the case of a partnership, association, trust or other entity, fifty percent or more of the capital, profits or beneficial interest in such partnership, association, trust or other entity."

The key term in these provisions is "acquisition". For purposes of the gains tax, if no partner acquires a controlling interest in the partnership, there is no transfer subject to the tax. In the case of a corporation which has an interest in real property, the acquisition of a controlling interest in the corporation occurs when an individual, group of individuals acting in concert to avoid the tax, or another entity becomes the owner of 50% or more of the voting stock in such corporation. Because the statute looks to the acquisition of the controlling interest, it is the act of the transferee which triggers the tax.

For your further information, I am enclosing a copy of Publication 588 containing questions and answers on the gains tax or real property transfers.

Very truly yours,
JOHN P. DUGAN
Deputy Commissioner and Counsel
TWS/cjm
Enclosure

State of New York

Department of

Taxation and Finance

Albany, New York 12227

Law Bureau

State Campus,

Albany, New York 12227

November 14, 1983

Dear :

This letter is in response to your inquiry of September 23, 1983 regarding Article 31–B of the Tax Law, The New York Real Property Transfer Gains Tax. You asked whether the payment of tax pursuant thereto would avail the taxpayer of a credit or deduction for partnership or individual income tax purposes. It is our opinion that, if anything, a deduction would be allowed.

The treatment of taxes for such purposes largely depends upon the classification of the tax. Comparably classified taxes generally receive similar deduction treatment. The New York State Real Property Transfer Gains Tax is a levy on gains derived from the transfer by any method of an interest in real property located in New York where the consideration is one million dollars or more.

The tax is classified by New York as a transfer tax rather than a property tax

because it is triggered by the transfer of the property, not by other incidents of ownership, and not levied on the land itself.

It should be noted, however, that though the Department's views are expressed herein, the Internal Revenue Service will ultimately determine the deductibility of the gains tax for Federal tax purposes, and that State tax policy is usually formulated in accordance with the Federal treatment of the tax. It is our opinion, in light of Revenue Ruling 80–121, that the Internal Revenue Service will classify the gains tax as being a transfer tax. In that ruling, Vermont's land gains tax, as imposed by sections 10001 through 10010, Title 32, of the Vermont Statutes Annotated, was deemed to be a transfer tax. The Vermont land gains tax is conceptually similar to New York's gains tax in that the Vermont statute levies a tax on gain from the sale or exchange of land. Under their statute, a sale or exchange of land is any transfer of title to land for a consideration, and taxable gain is the amount realized from a sale or exchange of land, less the transferor's basis in the land.

Section 164(a) of the Internal Revenue Code describes various types of taxes that are allowed as a deduction for the taxable year within which paid or accrued. Specifically allowed are: (1) State and local real property taxes; (2) State and local personal property taxes; (3) State and local income taxes; and (4) State and local general sales taxes. Section 164(a) of the Code also allows, as a deduction, State and local taxes not specifically described that are paid or accrued within the taxable year in carrying on a trade or business or an activity described in section 212 (relating to expenses for the production of income).

In determining that the Vermont land gains tax is a transfer tax, Revenue Ruling 80–121 first distinguished other forms of taxes as not being applicable. The Ruling provides, in pertinent part, as follows:

"The Vermont land gains tax is not imposed or triggered by the ownership of real property, but rather, by the exercise of one of the incidents of property ownership, the transfer of real property at a gain. The land gains tax is not measured by the value of the real property, but rather, by the gain derived from the transfer of that property.... Thus, the land gains tax is not a real property tax within the meaning of section 164(a)(1) of the Code."

With respect to the Vermont land gains tax qualifying as a State income tax within the meaning of section 164(a)(3) of the Code, the Revenue Ruling distinguishes the land gains tax from Federal income taxes, stating that the State tax, unlike the Federal income tax, is not structured to fall on net gain. The taxpayer, as a result of the gains tax, cannot reduce taxable gain from sales or exchanges of land during the taxable year by any losses from other sales or exchanges of land during that year. Under Federal income tax law, taxpayers are allowed to reduce gains from sales or exchanges of land by losses from sales or exchanges of land. Noting that a taxpayer could be required to pay the land gains tax even though under Federal income tax laws that same taxpayer may have a net loss from sales or exchanges of land, the ruling concluded that the tax is not an income tax under section 164(a)(3) of the Code.

In light of Revenue Ruling 80–121, it is the Department's opinion that the New York State Real Property Transfer Gains Tax is a transfer tax, and for purposes of Federal deductibility, the tax is deductible for purposes of computing adjusted gross income under section 164(a) of the Internal Revenue Code only to the extent that it is paid or accrued within the taxable year in carrying on a trade or business, or in connection with an activity described in section 212 of the Internal Revenue Code relating to expenses for the production of income.

For State income tax purposes, section 612 of the Tax Law provides that the New York adjusted gross income of a resident individual means his Federal adjusted gross income, with certain modifications. Since the State gains tax will be deductible for purposes of computing Federal adjusted gross income, it will automatically be excluded from the computation of New

York adjusted gross income, since there is no provision in the Tax Law adding back such amounts for purposes of such computation. A similar provision is found in Article 9–A of the Tax Law, the corporate franchise tax. Section 208 defines "entire net income" to mean total net income from all sources, which shall be presumably the same as the entire taxable income which the taxpayer is required to report to the United States Treasury Department. Since the State gains tax will be deducted from the taxable income the taxpayer is required to report to the United States Treasury Department, the tax will automatically be excluded from the computation of the state franchise tax since there is no provision adding it back for purposes of computing entire net income.

For your further information, I am enclosing a copy of Publication 588 containing questions and answers on the gains tax or real property transfers.

Very truly yours,
JOHN P. DUGAN
Deputy Commissioner and Counsel

LMP:pbc

Enclosure