101 F.3d 272
 65 USLW 2438, 29 Bankr.Ct.Dec. 1326,
Bankr. L. Rep. P 77,185
 In re LEHAL REALTY ASSOCIATES, Debtor.
George LEBOVITS, a principal and equity holder of Lehal
Realty Associates, Debtor-Appellant,
v.
John F. SCHEFFEL, as Trustee of Lehal Realty Associates,
Trustee-Appellee.
 No. 100, Docket 96-5007.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 5, 1996.
Decided Nov. 27, 1996.
 
 Harvey S. Barr, Spring Valley, NY (Barr & Rosenbaum, LLP, Elizabeth A. Haas, on the brief), for Debtor-Appellant.
 Richard L. Magro, White Plains, NY (Voute, Lohrfink, Magro and Collins, of counsel), for Trustee-Appellee.
 Before: FEINBERG, CARDAMONE and McLAUGHLIN, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 George Lebovits, a 75% general partner in debtor Lehal Realty Associates (Lehal), appeals from an order of the United States District Court for the Southern District of New York, Charles L. Brieant, J. The order enjoined the prosecution of a pending action brought by Lebovits and his partner in a New York State court against appellee John F. Scheffel, Esq., the debtor's trustee in bankruptcy, for breach of fiduciary duty. The action had been brought without the permission of the bankruptcy court. The principal issue before us is whether Judge Brieant erred in granting the injunction. We hold that, on the record before us, he did not. For reasons set forth below, we affirm the order of the district court.
 
 I. Facts and Proceedings Below
 
 2
 In February 1989, an involuntary Chapter 11 petition in bankruptcy was filed against Lehal in the Southern District. Appellee Scheffel (the Trustee) was appointed trustee of the debtor in August 1989. Thereafter, Bankruptcy Judge Howard J. Schwartzberg approved a plan of reorganization that contemplated the liquidation of the debtor's only significant asset, a parcel of real estate located in Rockland County, New York. The property was sold at public auction for $7,600,000.
 
 
 3
 New York State imposes a tax of 10% (the Gains Tax) on profits from the sale of real property, calculated by subtracting from the sale price an amount equal to the price that the seller paid to acquire the property plus the value of certain capital improvements. N.Y. Tax Law Art. 31B, § 1441 et seq. (McKinney 1987). In order to record a deed transferring property selling for more than a specified minimum amount (concededly exceeded here), the law requires the transferor either to pay the Gains Tax or to obtain a waiver from the New York State Department of Taxation and Finance (the State).
 
 
 4
 The State computed the gain subject to tax on the proposed sale to be $6,463,288.50, with a total tax due of $646,328.85. The Trustee had apparently unsuccessfully taken the position with the State that some five million dollars in capital improvements should have been included in the debtor's cost basis in calculating the amount of Gains Tax due (the basis argument). Pursuant to authority granted by the bankruptcy court and in order to consummate the sale of the real property, the Trustee paid the tax in February 1990. However, he did so under protest, reserving his right to commence proceedings to recover the funds.
 
 
 5
 In July 1990, in an unrelated case, Bankruptcy Judge Tina L. Brozman of the Southern District held that a debtor's sale of real property pursuant to an approved plan of reorganization was exempt from the Gains Tax as a "stamp tax or similar tax" under § 1146(c) of the Bankruptcy Code. 11 U.S.C. § 1146(c).[1] In re 995 Fifth Ave. Assoc., L.P., 116 B.R. 384 (Bankr.S.D.N.Y.1990).
 
 
 6
 Relying on that decision, the Trustee filed with the State in November 1990 a claim for refund of the Gains Tax he had paid. The claim asserted that, pursuant to § 1146(c), the transfer was exempt from the Gains Tax. It does not appear that the Trustee also raised the basis argument.
 
 
 7
 The State rejected the claim in a letter dated May 13, 1991. The State disagreed with the Trustee's interpretation of § 1146(c), and relied on an earlier bankruptcy court decision for the proposition that the Gains Tax was not a stamp tax or similar tax under § 1146(c). In re Jacoby-Bender, Inc., 40 B.R. 10 (Bankr.E.D.N.Y.1984), aff'd. 758 F.2d 840 (2d Cir.1985). The State's letter stated:
 
 
 8
 In accordance with Section 1445.2 of the Tax Law, this determination shall be final and irrevocable unless claimant within ninety (90) days files with [sic] a request for Conciliation Conference with the Bureau of Conciliation and Mediation Services or a Petition for Tax Appeals Hearing with the Division of Tax Appeals. The enclosed Form TA-9.1 explains this procedure.
 
 
 9
 The Trustee did not follow either course suggested in the letter. Instead, in June 1991 he commenced an adversary proceeding in the bankruptcy court against the State to recover the Gains Tax already paid.
 
 
 10
 The Trustee's complaint in the adversary proceeding contained two causes of action: the first raised the stamp tax exemption argument, and the second the basis argument. In October 1991, Bankruptcy Judge Schwartzberg concluded that he had the authority to determine the amount or legality of the Gains Tax pursuant to 11 U.S.C. § 505, but had no authority to compel the State to refund any portion of the tax because the State had not waived its Eleventh Amendment right of sovereign immunity. In re Lehal Realty Associates, 133 B.R. 9 (Bankr.S.D.N.Y.1991). On this view, the bankruptcy judge did not reach the merits of the Trustee's basis argument.
 
 
 11
 In December 1991, the Trustee filed an administrative tax appeal with the State from its denial in May 1991 of his refund claim. The Trustee and the State thereafter stipulated to adjourn the administrative appeal until this court decided an already argued appeal growing out of Bankruptcy Judge Brozman's decision in 995 Fifth Avenue.[2] Our opinion in that case was issued in April 1992. We held that the Gains Tax is not a stamp tax or similar tax for purposes of 11 U.S.C. § 1146(c), and that a trustee in bankruptcy therefore must pay it. 963 F.2d 503. Certiorari in 995 Fifth Ave. was denied in October 1992. 506 U.S. 947, 113 S.Ct. 395, 121 L.Ed.2d 302.
 
 
 12
 Thereafter, the Trustee applied to the bankruptcy court for permission to abandon the pending administrative tax appeal. Judge Schwartzberg granted the relief, but by separate order dated April 6, 1993, permitted Lebovits and his partner[3] to continue the administrative appeal in place of the Trustee. Lebovits did so, but was denied relief by the State because of the Trustee's earlier failure to file a timely administrative appeal within the 90-day period that began with the State's denial of the refund in May 1991.
 
 
 13
 In response to this adverse decision and without obtaining the permission of the bankruptcy court, Lebovits in January 1995 filed an action in state court (the State Court Action) against the Trustee and his law firm. The complaint alleged, among other things, that the Trustee's failure to file a timely administrative tax appeal constituted "negligence and malpractice" in breach of his "fiduciary duty." The State Court Action seeks to hold the Trustee personally liable for the amount of the Gains Tax refund to which Lebovits alleges Lehal was entitled. The Trustee appeared in the suit and issue was joined.
 
 
 14
 In May 1995, the Trustee filed a Final Report with the bankruptcy court. He also simultaneously requested that he be discharged from his obligations as trustee, and that the bankruptcy court enjoin continuation of the State Court Action against him. After a hearing in the bankruptcy court, Bankruptcy Judge John J. Connelly[4] issued an order closing the debtor's Chapter 11 case and discharging the Trustee from his duties, but refusing to enjoin the State Court Action against him. The judge was aware that Lebovits had not sought permission of the bankruptcy court to sue the Trustee in state court but stated that, if necessary, he would grant such permission retroactively.
 
 
 15
 The Trustee appealed Bankruptcy Judge Connelly's decision to the district court. Judge Brieant affirmed the bankruptcy court's discharge of the Trustee, but reversed that court in part by enjoining Lebovits from pursuing the State Court Action. The judge reasoned that proceedings against a Trustee for alleged breach of duty in connection with the administration of the estate should be heard in the bankruptcy court or, if necessary to preserve the right to a trial by jury, in the district court. Judge Brieant also noted that
 
 
 16
 Judge Connelly stated on the record that if the Bankruptcy Court's approval would be necessary to bring the state proceeding, he would retroactively grant such approval. Because of the important interest the Bankruptcy Court and this Court has in overseeing and correcting the conduct of its officers, this Court concludes that any such approval in this case would have been an abuse of judicial discretion.
 
 
 17
 This appeal followed.
 
 II. Discussion
 
 18
 Appellant Lebovits offers us a number of reasons why Judge Brieant erred in refusing to allow the State Court Action to proceed. Unsurprisingly, the Trustee defends Judge Brieant's order.
 
 
 19
 Lebovits argues in general terms that a bankruptcy trustee owes a fiduciary duty to all parties in interest and that such a trustee can be held personally responsible for breach of that duty. The Trustee concedes the former proposition, but argues that because he was acting within his authority and was administering and liquidating the estate rather than carrying out its business, he cannot be held personally liable. As will be seen below, the Trustee's argument overstates his case in light of In re Gorski, 766 F.2d 723 (2d Cir.1985).
 
 
 20
 Lebovits also argues that a bankruptcy court does not have exclusive jurisdiction over suits against a trustee for breach of duty. While that may be true in some circumstances, it does not mean that the bankruptcy court or the district court in this case did not have jurisdiction to decide whether to allow the State Court Action to proceed.
 
 
 21
 Also, both Lebovits and the Trustee discuss the distinction in bankruptcy cases between core and non-core proceedings as though that were determinative here. But, as Judge Wisdom has pointed out in Matter of Wood, 825 F.2d 90, 91 (5th Cir.1987), that distinction was designed to deal with the problem of vesting "Article III judicial power in Article I judges," and is of fairly recent origin.[5] On the other hand, there is a long history of cases dealing with attempts to hold a bankruptcy trustee personally liable for breach of duty.
 
 
 22
 A trustee in bankruptcy is an officer of the court that appoints him. In re Beck Industries, Inc., 725 F.2d 880, 888 (2d Cir.1984). We have held that there is "no question that a trustee in bankruptcy may be held personally liable for breach of his fiduciary duties." In re Gorski, 766 F.2d at 727 (citing Mosser v. Darrow, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951)). In Gorski, we noted that in "the usual case, a surcharge is imposed [by the bankruptcy court] on the fiduciary in the amount of the actual or estimated financial harm suffered by either the creditors or the estate and is payable accordingly." 766 F.2d at 727. At the same time, the court that appointed the trustee has a strong interest in protecting him from unjustified personal liability for acts taken within the scope of his official duties. A well-recognized line of cases starting with Barton v. Barbour, 104 U.S. 126, 26 L.Ed. 672 (1881), extends such protection by requiring leave of the appointing court before a suit may go forward in another court against the trustee. See, e.g., Vass v. Conron Bros. Co., 59 F.2d 969 (2d Cir.1932) (L. Hand, J.); In re DeLorean Motor Co., 991 F.2d 1236 (6th Cir.1993); In re Baptist Medical Center of New York, 80 B.R. 637, 643 (Bankr.E.D.N.Y.1987); Lawrence P. King et al., 2 Collier on Bankruptcy p 323.02 at 323-10 to 323-11 (15th Ed.1996).
 
 
 23
 These precedents provide the context for our review of Judge Brieant's order reversing in part the decision of Bankruptcy Judge Connelly. "An order of a district court functioning in its capacity as an appellate court in a bankruptcy case is subject to plenary review. Thus, we 'independently review the factual determinations and legal conclusions of the bankruptcy court.' " In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir.1994) (quoting In re PCH Assoc., 949 F.2d 585, 597 (2d Cir.1991)). We review the bankruptcy court's legal conclusions de novo, and its findings of fact are subject to a clearly erroneous standard. Id. Finally, we review its exercise of discretion for abuse.
 
 
 24
 Lebovits argues that there is a statutory exception to the Barton line of cases, which allows "[t]rustees ... [to] be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property." 28 U.S.C. § 959(a); see also In re DeLorean, 991 F.2d at 1240-41. Lebovits claims that the Trustee's actions in selling the debtor's real estate, and paying and appealing the Gains Tax, constituted "carrying on business" for purposes of § 959.
 
 
 25
 Bankruptcy Judge Connelly appeared to accept this reasoning. However, Judge Brieant rejected it, concluding that § 959
 
 
 26
 is intended to permit actions redressing torts committed in furtherance of the debtor's business, such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store.
 
 
 27
 This section is not intended to apply to a breach of a fiduciary duty in the administration of a bankruptcy estate.
 
 
 28
 We agree with Judge Brieant that § 959 does not apply where, as here, a trustee acting in his official capacity conducts no business connected with the property other than to perform administrative tasks necessarily incident to the consolidation, preservation, and liquidation of assets in the debtor's estate. See, e.g., Vass v. Conron Bros., 59 F.2d at 971; In re DeLorean Motor Co., 991 F.2d at 1240-41; Matter of Campbell, 13 B.R. 974 (Bankr.D.Idaho 1981); Maguire v. Puente, 120 Misc.2d 871, 466 N.Y.S.2d 934 (N.Y.Sup.Ct.1983). Accordingly, under the Barton line of cases, Lebovits was required to obtain the permission of the bankruptcy court before bringing the State Court Action.
 
 
 29
 Lebovits responds that he did obtain from Bankruptcy Judge Connelly retroactive leave to file the State Court Action, and that Judge Brieant erred in reversing Judge Connelly in this respect. Bankruptcy Judge Connelly's decision rested primarily on his conclusion that, "since the case is fully administered no bankruptcy purpose would be served by [his] hearing the State Court case which is in progress." Judge Brieant rejected this view because of "the important interest" the bankruptcy court and the district court have "in overseeing and correcting the conduct of its officers." In particular, the judge said:
 
 
 30
 the Bankruptcy Court has overseen all aspects of the case and the entire record here was developed under the court's supervision. The [Gains Tax] was paid initially under the express authority of the Bankruptcy Court as a result of an order issued on notice. The Bankruptcy Court is uniquely situated to determine any issue regarding the appropriateness or good faith of the trustee's actions. Because the trustee is an officer of the Bankruptcy Court, the Bankruptcy Court and this Court has an overriding interest in his administration of the estate. We have an institutional interest in holding our trustees fully responsible for breaches of their fiduciary duty, including the duty to exercise due care.
 
 
 31
 Judge Brieant went on to note his view of the merits of Lebovits's action against the Trustee.
 
 
 32
 We have an equally vital institutional interest in protecting our trustee from being mulcted into another court on frivolous or trumped up charges. This State Court lawsuit appears to be of questionable merit ...
 
 
 33
 Accordingly, Judge Brieant enjoined Lebovits from prosecuting the State Court Action.
 
 
 34
 We cannot say on the facts before us that Judge Brieant erred in reversing the bankruptcy court. The institutional concerns the judge alluded to are weighty. And in considering whether to subject the Trustee to further litigation, the judge undoubtedly took into account that the Trustee's efforts had resulted in payment of all creditors and administration expenses in full and in a return to the principals of the debtor of several million dollars. Moreover, and contrary to the conclusion of Bankruptcy Judge Connelly, we do not agree that the State Court Action could have had no effect on the bankruptcy estate at the time that action was brought. The Gains Tax had been paid directly from the property of the estate. The State Court Action seeks significant monetary recovery, and Lebovits is not the only residual beneficiary. At least some portion of any hypothetical recovery would accrue to the 25% partner in Lehal. Since, as the record makes clear, the partners in Lehal have disagreed over the division of even small sums remaining in the Trustee's hands, it is difficult to believe that a substantial recovery could be shared without involving the bankruptcy court, thus having an effect on the bankruptcy estate.
 
 
 35
 In addition, the core of the State Court Action is that the Trustee was negligent in not pursuing the basis argument for a tax refund. But even if that were so, all of the equities of the situation had to be taken into account. Judge Brieant did not regard the merits of the basis argument as very substantial, a view apparently shared by the Trustee. It is true that the Trustee apparently raised the claim with the State before the Gains Tax was paid, but Bankruptcy Judge Schwartzberg approved payment of the full tax in an amount up to $760,000. Thereafter, a claim for a refund was not filed for about nine months, and then only after Bankruptcy Judge Brozman issued her decision (later reversed), which completely exempted a sale pursuant to an approved plan of reorganization from the Gains Tax. The Trustee's claim for a refund then relied on that argument, and it does not appear that the basis argument was also raised. While all of this was going on under the aegis of the bankruptcy court, Lebovits presumably knew or should have known, as the principal partner of the debtor, that the basis claim was being pushed weakly, if at all. Certainly Lebovits not only had the incentive to keep informed but also was intensely involved in other proceedings in the bankruptcy court. E.g., Lebovits v. Halpern, 112 B.R. 601 (Bankr.S.D.N.Y.1990). The basis claim was clearly raised by the Trustee in his adversary complaint against the State brought in June 1991 in the bankruptcy court after his claim for refund had been rejected. And, that complaint had attached to it the State's May 1991 letter rejecting the Trustee's claim for a refund, which contained the 90-day notice for administrative appeal. But even then, well within the 90-day period, nothing in the record before us indicates that Lebovits pointed out to the bankruptcy court or to the Trustee that an administrative tax appeal should be pursued instead, or simultaneously, either on the exemption claim (which seemed to be a winning argument at that time) or on the basis argument. In short, under all the circumstances, we cannot say that Judge Brieant erred in enjoining the State Court Action.
 
 
 36
 We affirm the order of the district court.
 
 
 
 [1]
 Section 1146(c) provides:
 [t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.
 
 
 [2]
 That decision had been affirmed by the district court in May 1991. 127 B.R. 533 (S.D.N.Y.)
 
 
 [3]
 For convenience, we will hereafter refer only to Lebovits as the party in interest
 
 
 [4]
 Bankruptcy Judge Schwartzberg had died in March 1994
 
 
 [5]
 Judge Wisdom summed up the history of these jurisdictional provisions as follows:
 Years of effort to reform the bankruptcy laws culminated with the enactment of the Bankruptcy Reform Act of 1978. As part of its overall goal to create a more efficient procedure for administering bankruptcies, the 1978 Act vested broad powers in the bankruptcy courts. This reform was shortlived. In 1982 the Supreme Court decided Northern Pipeline v. Marathon, [458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ]. The Court declared the jurisdictional provision of the 1978 Act unconstitutional because, in short, it vested Article III judicial power in Article I judges. Courts were left to their own devices while Congress deliberated a response to Marathon. With prompting from bench, bar, and law professors with expertise in bankruptcy, Congress responded with the Bankruptcy Amendments and Federal Judgeship Act of 1984. Essentially, Congress reenacted the 1978 Act, but divided its jurisdictional grant into "core" proceedings, over which the bankruptcy courts exercise full judicial power--and "otherwise related" or "non-core" proceedings--over which the bankruptcy courts exercise only limited power.
 (footnotes omitted). Id.